BEEBE MEDICAL CENTER, INC. a
non-profit Delaware corporation,
Plaintiff,

v.

InSIGHT HEALTH SERVICES CORP.,
a Delaware corporation, Defendant.

InSight Health Services Corp.,
a Delaware corporation,
Plaintiff,

v.

Beebe Medical Center, Inc., a non-
profit Delaware corporation,
Defendant.

Civil Action Nos. 16324, 16705.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 28, 1999.
Decided: Nov. 4, 1999.
Corrected: Dec. 10, 1999.

William E. Manning, Daniel B. Rath, of Duane, Morris & Heckscher, Wilmington, for Beebe Medical Center.

Samuel A. Nolen, Megan Semple Greenberg, of Richards Layton & Finger, Wilmington; of Counsel: Veronica M. Gray, of Resnick & Gray, Newport Beach, CA, for InSight Health Services Corp.

James S. Yoder, of Tighe, Cottrell & Logan, Wilmington, for Walter S. Rowland and the American Arbitration Association.

## OPINION

STRINE, Vice Chancellor.

An arbitrator, Walter S. Rowland, Esquire, heard a dispute (the "Arbitration") in which one of the parties, defendant InSight Health Services Corp., was represented by a law firm, Stradley, Ronon, Stevens & Young ("Stradley Ronon"), that was simultaneously representing Rowland in litigation in the Superior Court of Delaware. Rowland cast his vote on liability against Beebe Medical Center, Inc., the plaintiff in this action Rowland's vote was decisive, as the Arbitration was decided on a 2–1 vote of the panel, and an award adverse to Beebe and favorable to InSight was issued ("the Award"). Only after the liability aspect of that decision did Rowland's client relationship with Stradley Ronon surface.

Beebe now seeks to vacate the Award, contending that Rowland's client-lawyer relationship with Stradley Ronon constitutes "evident partiality" under § 5714(a)(2) of the Delaware Uniform Arbitration Act ("DUAA").[1] When an arbitration award has been issued by an arbitrator who was evidently partial, § 5714(a)(2) requires that the award be vacated.

■ In this opinion, I find that where an arbitrator does not disclose a relationship with a party or a party's attorney that creates a reasonable impression of bias, evident partiality is demonstrated and vacatur is required under § 5714(a)(2). The statute's pro-arbitration policy is best advanced by requiring arbitrators to disclose such relationships to the parties before arbitration, thereby giving the parties the opportunity to choose another arbitrator or to knowingly waive any objections based on the conflict. Because Rowland did not disclose his relationship with Stradley Ronon in a timely manner, I grant Beebe's motion to vacate the Award.

I.

InSight and Beebe had a contract through which InSight provided mobile diagnostic imaging services to Beebe. A dispute arose between the parties relating to Beebe's attempt to terminate its relationship with InSight. On November 1, 1996, InSight filed an arbitration claim in accordance with the contract's dispute resolution clause, which provided for arbitration under the American Arbitration Association's ("AAA") Commercial Arbitration Rules ("AAA Commercial Rules"). Resnick & Gray, a California law firm, and Stradley Ronon represented InSight in the Arbitration. Shortly afterward, the AAA sent InSight and Beebe lists of potential arbitrators. Rowland was on the list. The parties each had the right to strike, for any reason, five of the fifteen potential arbitrators on the list. Neither objected to Rowland.

1. 10 *Del. C.* § 5714(a)(2).

As part of the arbitrator selection process, AAA required the parties to complete a disclosure form calling for the identification of all "interested parties in this case, including but not limited to, witnesses, consultants and attorneys."[2] The purpose of the form was to "avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator(s) pursuant to the rules . . . ."[3]

On November 21, 1996, InSight filed the form and identified that Richard K. Herrmann of Stradley Ronon would be on the team representing InSight in the Arbitration. The AAA named Rowland to the three-member Arbitration panel (the "Panel") on February 7, 1997.

Meanwhile, in September of 1997, litigation was initiated in the Superior Court against Hercules Corporation on behalf of Rowland and 97 other former Hercules employees (the "Hercules Litigation"). Stradley Ronon attorney Richard K. Herrmann signed the complaint on behalf of himself and his colleague Mary B. Matterer as Delaware counsel. The law firm of Reed Smith Shaw & McClay was identified on the complaint as "of counsel."

On October 23, 1997, the Panel heard oral argument on the parties' cross-motions for summary judgment. Matterer of the Stradley Ronon firm appeared as one of the lawyers representing InSight. Less than two weeks later, Matterer signed and filed an amended complaint on behalf of Rowland and the other plaintiffs in the Hercules Litigation.

On November 12, 1997, John Crane, the coordinator of the steering committee for the plaintiffs in the Hercules Litigation, apparently sent a communication to all plaintiffs updating them on the status of the case. This letter stated in pertinent part:

I believe we are well represented. Mr. Stephen P. Murphy, our lead counsel from Reed Smith Shaw and McClay, Washington, D.C.[,] has retained Richard K. Herrmann of Stradley, Ronon, Stevens and Young, Wilmington, DE as our local counsel.[4]

Hearings in the liability phase of the Arbitration started on December 15, 1997 and lasted until early January of 1998. Another member of the Panel disclosed a potential conflict to the parties. Rowland did not disclose that Stradley Ronon represented him in the Hercules Litigation. Matterer of the Stradley Ronon firm—the same attorney who, with Herrmann, had filed the Hercules Litigation complaints on behalf of Rowland—appeared as part of InSight's litigation team, although Veronica Gray of the Resnick & Gray firm handled most of the hearings. Although InSight attempts to trivialize Stradley Ronon's role in the Arbitration, Stradley Ronon billed $92,377.59 for 452 hours of work on the matter.[5] Matterer and Herrmann accounted for 317 hours and 35 hours, respectively, of that time.[6]

On January 16, 1998, the Panel informed the parties that they had voted 2–1 that Beebe was liable to InSight for breach of contract. Further hearings were to be scheduled to determine the amount of damages. The votes of the Panel members were not revealed.

In the interim, the Hercules Litigation Steering Committee had approved a settlement in that case. On January 13, 1998, Rowland sent to Stephen Murphy of Reed Smith a sharply worded letter objecting to the method by which damages would be distributed to plaintiffs under the settlement. Rowland expressed the view that the Steering Committee and Reed Smith would be liable for any damages caused to

**2.** Beebe Ex. 13.

**3.** *Id.*

**4.** Beebe Ex. 12.

**5.** Beebe Ex. 26.

**6.** *Id.* Beebe was required to pay those fees as part of the Award.

Rowland if they distributed funds under the settlement formula.

Rowland and two other plaintiffs in the Hercules Litigation then hired the Bayard Firm and had it enter an appearance on their behalf. There then ensued a battle between the Bayard Firm and the Stradley Ronon/Reed Smith firms over whether Rowland and the other two plaintiffs had a right to substitute counsel. On February 27, 1998, Herrmann of the Stradley Ronon firm wrote the Superior Court and objected to Rowland's and the other plaintiffs' attempt to substitute new counsel.[7] Rowland apparently filed an affidavit with the court in regard to this dispute.[8] Despite Rowland's deep involvement in the Hercules Litigation at that time, Rowland did not disclose to the parties in the Arbitration the fact that Stradley Ronon represented him in that matter.

On March 6, 1998, a hearing was held in the Hercules Litigation to address the three dissenting plaintiffs' request to substitute the Bayard Firm for Stradley Ronon and Reed Smith. According to InSight, Matterer of the Stradley Ronon firm attended the hearing and recognized Rowland from the Arbitration. Matterer and Rowland spoke about Stradley Ronon's role in the Hercules Litigation, and Matterer allegedly learned for the first time that he was one of the plaintiffs in the Hercules Litigation.

Rowland did not bring that conversation to the attention of Beebe. Instead, on March 11, 1998, Stradley Ronon informed Beebe's counsel about Rowland's relationship with it.

On March 20, 1998, InSight and Beebe communicated with the AAA regarding the issue. InSight expressly asked the AAA to rule on the bias issue pursuant to Rule 19 of the AAA Commercial Rules, which I will discuss shortly. In support of that request, InSight contended that the Pan-

el's January 16, 1998 vote should not be set aside because Rowland did not learn of Stradley Ronon's connection to the Hercules Litigation until March 6, 1998.[9] InSight noted that if "Mr. Rowland was aware of the connection at any time prior to March 6, he did not disclose it to us." [10] It asked the AAA to determine that Rowland was not disqualified and to allow him to continue as a member of the Panel.

For its part, Beebe did not clearly seek Rowland's disqualification. Instead, Beebe wanted to know whether Rowland had voted against it. If he had not and his vote could not have been determinative, Beebe was not certain it would press the issue. But if Rowland had voted for InSight, Beebe would seek Rowland's disqualification and vacatur of the January 16, 1998 vote. In support of that position, Beebe argued that Stradley Ronon's simultaneous representation of Rowland and InSight rendered Rowland conflicted. Although Beebe was careful not to ascribe fault to anyone for failing to surface the issue, Beebe asserted that Rowland would never have been named to the Panel if either InSight or Rowland had made timely disclosure.

The AAA has a rule requiring its arbitrators to disclose relationships between arbitrators and parties or their attorneys. Rule 19 of the AAA Commercial Rules states:

(a) Any person appointed as a neutral arbitrator shall disclose to the AAA any circumstance likely to affect impartiality, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it

---

7. Beebe Ex. 38.

8. Beebe Ex. 40.

9. Beebe Ex. 19.

10. *Id.*

appropriate to do so, to the arbitrator and others.

(b) Upon objection of a party to the continued service of a neutral arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.[11]

The AAA also requires its arbitrators to abide by the Code of Ethics for Arbitrators in Commercial Disputes (the "Commercial Arbitrator's Code"), which was promulgated through a joint effort of the AAA and the American Bar Association. Canon I.D. of the Commercial Arbitrator's Code states that "[a]fter accepting appointment and while serving as an arbitrator, a person should avoid entering into any financial, business, professional, family or social relationship, or acquiring any financial or personal interest, which is likely to affect impartiality or which might reasonably create an appearance of partiality or bias."

Canon II of the Commercial Arbitrator's Code adopts the "prevailing principle that arbitrators should disclose the existence of interests or relationships that are likely to affect their impartiality or that might reasonably create an appearance that they are biased against one party or favorable to another."[12] It also requires arbitrators to "disclose any such relationships which they personally have with any party or its lawyer...."[13] Canon II.B. requires arbitrators to "make a reasonable effort to inform themselves of any interests or relationships described in [Canon II.A.]" Finally, Canon II.C. states:

The obligation to disclose interests or relationships described in [Canon II.A.] is a continuing duty which requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests or relationships which may arise, or which are recalled or discovered.[14]

The AAA did not hold a hearing on InSight's request for a decision under Rule 19 or Beebe's request to know Rowland's vote on liability. Indeed, the AAA did nothing about the issue until Beebe copied it on an April 14, 1998 letter to InSight threatening to file a suit in this court seeking vacatur of the liability decision and to refuse to participate in a damages hearing scheduled for April 21, 1998 if Rowland was to continue as a panel member. Apparently in hurried response to Beebe's letter, Demos K. Orphanides, a AAA Administrator, faxed Beebe and InSight a letter that afternoon, which stated in full:

This will acknowledge receipt of letters dated March 20 and April 14, 1998 from Mr. Manning and letters dated March 20 and April 14, 1998 from Ms. Gray, copies

---

11. AAA Commercial Rule 19 (as amended and effective Jan. 1, 1999). This opinion will refer to the current AAA Commercial Rules in the absence of any material change in the text requiring reference to the earlier version.

12. Commercial Arbitrator's Code, Canon II, Introductory Note.

13. *Id.,* Canon II.A.(2).

14. *Id.,* Canon II.B.
   The National Conference of Commissioners on Uniform State Laws is now considering revisions to the Uniform Arbitration Act ("Proposed UAA Revisions"). Included in the Proposed UAA Revisions is a new § 9 modeled on the Commercial Arbitrator's Code stating:

(a) Before accepting appointment, a person who is requested to serve as an arbitrator shall make an inquiry reasonable under the circumstances of an arbitration proceeding and disclose any facts learned that a reasonable person would consider likely to affect the impartiality of the arbitrator, including any:
   (1) financial or personal interest in the outcome of the arbitration proceeding; and
   (2) existing or past relationships with the parties to the agreement to arbitrate, their counsel or representatives, witnesses, or other arbitrators.
   (b) The obligation to disclose under subsection (a) is a continuing one that extends throughout the period of appointment as arbitrator.

of which we note were interchanged between counsel.

After carefully reviewing the parties' contentions, the Association hereby reaffirms Arbitrator Rowland as an arbitrator, and this matter will proceed with [the damages] hearings on April 21 and 22, 1998.[15]

Quite obviously, the letter does not articulate a basis for this decision or explain how Rowland's nondisclosure comported or did not comport with Rule 19 and his duties under the Commercial Arbitrator's Code. Nor did Orphanides reveal the votes of the Panel on liability. Two days later, Beebe filed this lawsuit seeking Rowland's disqualification.

On April 20, 1998, this court, per Chancellor Chandler, approved a stipulation whereby the parties agreed to complete the damages hearing without prejudice to Beebe's right to challenge Rowland's neutrality later in this court. The damages hearing then proceeded, and on June 17, 1998 the Panel issued the Award granting InSight $510,000 in damages plus attorneys' fees. On September 29, 1998, the AAA revealed for the first time that Rowland was the swing vote in favor of InSight.

## II.

■ It is common for this court to determine whether to vacate or confirm an arbitration award on cross-motions for summary judgment. As Chancellor Allen once noted, ordinarily "a summary judgment motion provides an appropriate judicial mechanism for reviewing an arbitration award, because the complete record is before the court and no *de novo* hearing is permitted to determine whether one of the five statutory exceptions is applicable."[16] This case tests the limits of that general proposition, because the parties differ sharply on the need for discovery and a possible trial.

Beebe argues that the court need not inquire into when Rowland became aware of the fact that Stradley Ronon was his own counsel as well as counsel for InSight, one of the parties in the Arbitration before him. Instead, Beebe asserts, the simple, undisputed fact that Rowland's and InSight's Delaware counsel were one and the same demonstrates the necessary partiality to justify summary judgment and vacatur under 10 *Del. C.* § 5714(a)(2).

InSight, meanwhile, contends that the fact that Rowland was represented by Stradley Ronon in litigation at the same time he was adjudicating the Arbitration in which Stradley Ronon was representing InSight is, without further evidence demonstrating partiality, insufficient to satisfy § 5714(a)(2). InSight suggests that there is no evidence that Rowland knew that Stradley Ronon was representing him in the Hercules Litigation, because Stradley Ronon had merely a minor local counsel role in that lawsuit. Indeed, InSight claims that what evidence exists of Rowland's involvement with Stradley Ronon in the Hercules Litigation suggests that Rowland would have been biased against—and not for—Stradley Ronon. For those reasons, InSight contends that, at the very least, summary judgment cannot be granted to Beebe until discovery into Rowland's knowledge of his representation by Stradley Ronon is completed.

InSight contends that such discovery is unnecessary, however, because the AAA, under whose Commercial Rules the Arbitration proceeded, considered Beebe's claim of partiality and rejected it. Therefore, says InSight, the issue is settled, because deference must be accorded the AAA's decision, given the parties' choice to proceed under the AAA Commercial

---

15. Beebe Ex. 23.

16. *Wier v. Manerchia,* C.A. No. 14836, mem. op. at 16, 1997 WL 74651, at *7, 1997 Del. Ch. LEXIS 17, at *24. Allen, C. (Jan 28, 1997), *aff'd without opinion,* Del.Supr., 700 A.2d 736 (1997).

Rules. Thus InSight seeks summary judgment affirming the Award.

### III.

To date, no depositions have been taken in this case. Earlier in this litigation, InSight believed that the case could be resolved without such discovery. It then backed away from that position and sought a deposition of Rowland and certain employees of the AAA. The purpose of this discovery was two-fold: to demonstrate that Rowland was unaware that Stradley Ronon was representing him in the Hercules Litigation before March 6, 1998, and to establish the fairness and adequacy of the AAA's review of Beebe's request to disqualify Rowland. Meanwhile, Beebe sought to depose InSight's attorney, Ms. Gray, regarding Rowland's alleged bias during the Arbitration. The AAA and Rowland objected to InSight's deposition requests, and InSight objected to Beebe's request to depose Ms. Gray.

On July 16, 1999, I granted Beebe's request to proceed with summary judgment motions and to put off deposition discovery. Such a procedure seemed efficient, because it was possible that the case could be resolved without putting the parties through the needless expense of deposition.

Most important, the discovery sought was of a quite sensitive nature, involving as it did a direct examination of Rowland's awareness of his representation by Stradley Ronon, of AAA employees regarding the process used and rationale adopted by the AAA in affirming Rowland's impartiality, and of InSight's Arbitration counsel regarding her assessment of Rowland's neutrality. Thus it seemed prudent to determine first whether such discovery was in fact necessary.

### IV.

Section 5714(a)(2) of Title 10 requires this court to vacate an arbitration award where "[t]here was evident partiality by an arbitrator appointed as a neutral ...." There is a dearth of case law in Delaware interpreting the evident partiality standard. Fortunately, the evident partiality standard in the DUAA derives from language in both the federal arbitration act ("FAA") and the Uniform Arbitration Act ("UAA"). The parties have therefore relied heavily upon case law interpreting the evident partiality standard under those Acts.

At this stage of the case, I must apply the evident partiality standard without knowing a fact that, at first blush, might seem essential: whether Rowland knew that Stradley Ronon was simultaneously representing him in the Hercules Litigation and InSight in the Arbitration. On this record, I cannot say with certainty whether Rowland was aware of that fact or not. While there is evidence that suggests that he was aware of Stradley Ronon's role in both cases, a finding to that effect can only be made after full discovery on the issue is taken.

What is undisputed is that Rowland was in fact represented by Stradley Ronon in the Hercules Litigation at the same time Stradley Ronon was representing InSight in the Arbitration. The simultaneous representation did not proceed through different attorneys at the Stradley Ronon firm; the same attorneys representing Rowland in the Hercules matter were representing InSight in the Arbitration. It is also undisputed that the Hercules Litigation was of substantial importance to Rowland; he had over $100,000 riding on its outcome and took a keen interest in its resolution. Finally, it is undisputed that Rowland's keen interest in the Hercules Litigation led him to seek the removal of Stradley Ronon as his counsel in that case.[17]

The question is whether this undisclosed, simultaneous relationship is, in it-

---

17. A major reason why Beebe can justly claim that it is difficult to conceive how Rowland could be unaware of Stradley Ronon's work on his behalf.

self, sufficient to constitute evident partiality under § 5714(a)(2). For the following reasons, I believe that the question must be answered in the affirmative.

Initially, it is important to recognize that the statutory phrase "evident partiality" has not been interpreted literally as requiring a showing of obvious bias for one party. Rather, the phrase has been read as reflecting a more general requirement that neutral arbitrators be impartial and unbiased. Thus the United States Supreme Court has stated that the evident partiality standard "show[s] a desire of Congress to provide not merely for any arbitration but for an impartial one."[18] The Wisconsin Supreme Court has interpreted identical language in its state's version of the UAA as reflecting a "clear legislative intent to require disinterested arbitration...."[19]

There is no reason to believe that the General Assembly, in adopting the evident partiality rule as the public policy of Delaware, had any different conception of its purpose. Indeed, the DUAA was adopted four years after the United States Supreme Court issued the most influential opinion interpreting the evident partiality standard, *Commonwealth Coatings Corp. v. Continental Casualty Co.*[20]

*Commonwealth Coatings* involved a dispute between a prime contractor and a subcontractor. The member of the three-person arbitration panel selected as a "neutral" was an engineering consultant. But the prime contractor turned out to be one of the consultant's regular customers. As the Court explained, "[a]n arbitration was held, but the facts concerning the close business connections between the third arbitrator and the prime contractor were unknown to [the other party] and

were never revealed to it by this arbitrator, by the prime contractor, or by anyone else until after an award had been made."[21]

The case came to the Supreme Court without any evidence that the arbitrator actually acted unfairly or impartially; if anything, the evidence was that the consultant was not influenced by his relationship with the prime contractor. Yet the Court concluded that the arbitrator's undisclosed business relationship with a party justified vacatur under the evident partiality provision.[22] The Court, per Justice Black and five other Justices, articulated its rationale as follows:

> [N]either this arbitrator nor the prime contractor gave to petitioner even an intimation of the close financial relations that had existed between them for a period of years. We have no doubt that if a litigant could show that a foreman of a jury or a judge in a court of justice had, unknown to the litigant, any such relationship, the judgment would be subject to challenge.... It is true that arbitrators cannot sever all their ties with the business world, since they are not expected to get all their income from their work deciding cases, but we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review. We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias....

**18.** *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 147, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), *reh'g denied*, 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969).

**19.** *Richco Structures v. Parkside Village, Inc.*, 82 Wis.2d 547, 263 N.W.2d 204, 210 (1978).

**20.** 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301.

**21.** 393 U.S. at 146, 89 S.Ct. 337.

**22.** *Id.* at 147, 89 S.Ct. 337.

We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another.[23]

Justices White and Marshall joined the majority decision, providing the necessary votes to make Justice Black's decision an Opinion of the Court. But Justice White issued a concurrence on behalf of himself and Justice Marshall stating their view that the majority opinion did not "decide . . . that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges."[24] Nor, in their view, did the Court decide "that arbitrators are . . . automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, *or if they are unaware of the facts but the relationship is trivial.*"[25] The concurring Justices were concerned that a stricter rule might disqualify able arbitrators, who necessarily function in the business world and have commercial relationships not typical of judges. The way to balance the value of arbitrators with relevant experience against the need for unbiased panels was, in the concurring Justices' view, to encourage full disclosure:

> This end is best served by establishing an atmosphere of frankness at the outset, through disclosure by the arbitrator of any financial transaction which he has had or is negotiating with either of the parties. . . .
>
> Of course, an arbitrator's business relationships may be diverse indeed, involving more or less remote commercial connections with great numbers of people. He cannot be expected to provide the parties with his complete and unexpurgated business biography. But it is enough for present purposes to hold, as the Court does, that where the arbitrator has a substantial interest in a firm which has done more than trivial business with a party, that fact must be disclosed. If arbitrators err on the side of disclosure, as they should, it will not be difficult for courts to identify those undisclosed relationships which are too insubstantial to warrant vacating an award.[26]

Federal courts have struggled over the meaning and application of *Commonwealth Coatings,* principally because of the unusual nature of Justice White's concurrence in which he purported to join the majority opinion while delimiting its application. Insofar as this case is concerned, however, it is of little moment whether Justice Black's or Justice White's views are the authoritative interpretation of the FAA's evident partiality standard.

Both Justice Black and Justice White persuasively explained the importance of full disclosure by arbitrators of relationships that might create a reasonable impression of bias. Justice White simply left open the possibility that an undisclosed relationship between a party and an arbitrator could be so insubstantial—or "trivial" as he put it—that vacatur was not required.

In the wake of *Commonwealth Coatings,* it is almost universally accepted that an arbitrator's failure to disclose a substantial relationship with a party or a party's attorney justifies vacatur under the evident

**23.** *Id.* at 147–50, 89 S.Ct. 337.

**24.** *Id.* at 150, 89 S.Ct. 337 (White, J. concurring).

**25.** *Id.* (emphasis added).

**26.** *Id.* at 151–52, 89 S.Ct. 337. Even Justice Fortas and two other dissenting Justices agreed that "failure of an arbitrator to volunteer information about business dealings with one party will, prima facie, support a claim of bias or partiality." *Id.* at 154, 89 S.Ct. 337. But the dissenters believed that the presumption of partiality created by nondisclosure had been overcome in *Commonwealth Coatings* because the challenging party disclaimed any contention that the arbitrator had in fact been partial because of his business relationship with the prime contractor. *Id.*

partiality standard. Judges have spilled many words on the pages of the federal reporters trying to put this standard into simple terms, but most agree that an arbitrator's nondisclosure of a relationship substantial enough to create a reasonable impression of bias will ordinarily dictate vacatur.[27] InSight itself accepts this standard, just in different words; it argues that the *Commonwealth Coatings* partiality standard is met where there is a "close or otherwise significant relationship between the arbitrator and one of the parties or their counsel which would demonstrate bias to a reasonable person." [28]

█ Although InSight disagrees, it seems to me obvious that Rowland had a substantial relationship with the Stradley Ronon firm that creates, as an objective matter, a reasonable impression of bias. Matterer of the Stradley Ronon firm was filing complaints on behalf of Rowland in a matter worth over $100,000 to him at the same time she was litigating in front on him on behalf of InSight.[29] Unlike InSight, I am unwilling to conclude that Stradley Ronon's mere role as local counsel in the Hercules Litigation and the Arbitration rendered the relationship a trifle. Such a conclusion would be contrary to Delaware public policy, which quite explicitly holds local counsel to the same standards as in cases where no co-counsel has been admitted *pro hac vice.*[30] Such a con-

27. *E.g., Schmitz v. Zilveti,* 20 F.3d 1043, 1046 (9th Cir.1994) (evident partiality was demonstrated where an arbitrator failed to disclose a relationship with a party that created "a reasonable impression of bias") *(quoting Middlesex Mut. Ins. Co. v. Levine,* 675 F.2d 1197, 1201 (11th Cir.1982)); *Morelite Constr., Corp. v. New York City District Council Carpenters Benefit Funds,* 748 F.2d 79, 84 (2d Cir.1984) (" 'evident partiality' ... will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration"); *Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 51 F.3d 157, 160 (8th Cir.1995) (where arbitrator failed to disclose non-trivial business relationships with party, vacatur was required under the evident partiality standard), *reh'g en banc denied,* 1995 U.S.App. LEXIS, 10234 (8th Cir. May 8, 1995); *see also* Proposed UAA Revisions § 9 n. 3 ("disclosure is required of facts which a reasonable person would consider likely to affect the arbitrator's impartiality"). Other courts have emphasized the need to ensure that trivial relationships do not suffice to upset arbitration awards by articulating the test in somewhat more exacting terms. *E.g., Merit Insur. Co. v. Leatherby Insur. Co.,* 714 F.2d 673, 680 (1983) (test is "whether, having due regard for the different expectations regarding impartiality that parties bring to arbitration than litigation, the relationship ... cast[s] serious doubt on [the arbitrator's] impartiality"), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983); *U.S. Wrestling Fed'n v. Wrestling Div. of the AAU, Inc.,* 605 F.2d 313, 318 (7th Cir.1979) (to justify vacatur, undisclosed interest must be "direct, definite, and capable of demonstration"). Even if these tests are appropriate interpretations of *Commonwealth Coatings,* their application here would not alter my conclusion.

28. InSight Op. Br. at 21.

29. In analogous circumstances, judges have been found disabled because of client relationships between themselves and attorneys appearing before them. *See, e.g., Rapp v. Van Dusen,* 350 F.2d 806, 813–14 (3d. Cir.1965) (trial judge was disqualified from continuing in a case because he allowed counsel for one party to act as his counsel in responding to a mandamus petition seeking to vacate one of his orders in the same case); *In re Disqualification of Badger,* 47 Ohio St.3d 604, 546 N.E.2d 929, 929 (Oh.1989) (judge who was represented by counsel for one of the defendants in an unrelated matter was disqualified).

The American Bar Association's Committee on Ethics and Professional Responsibility has opined under rules similar to the Delaware Judges' Code of Judicial Conduct that:

> In the absence of proper remittal of disqualification, and the absence of the applicability of the rule of necessity, the Committee's view is that, when a private lawyer is currently representing a judge, even in a matter involving that judge's official position or conduct, the judge should not sit in a case in which a litigant is represented by the lawyer or by the lawyer's partner or associate.

ABA Comm. On Ethics and Prof. Resp., Informal Op. 1477 (1981).

30. Del.Super. Ct. Civ. R. 90.1(a), (d); Del.Super. Ct. Civ. R. 11; *see also Paramount Communications v. QVC Network,* Del.Supr., 637 A.2d 34, 55–56 (1994) (describing some of the ongoing duties of local counsel in a case where other counsel had been admitted *pro hac vice* ).

clusion would also be contrary to actual practice in the Delaware courts, where local counsel frequently play as important a role in litigation as their out-of-state colleagues.[31]

InSight implicitly concedes that if Rowland was aware of Stradley Ronon's representation of him and if Stradley Ronon had played a major role in the Hercules Litigation, then Rowland's failure to disclose would implicate the evident partiality standard. But InSight contends that discovery will reveal that: Rowland first became aware of Stradley Ronon's role in March 1998; Stradley Ronon played only a bag-carrying role in the Hercules Litigation; and, if anything, Stradley Ronon's participation in the Hercules Litigation gave Rowland reason to be biased against Stradley Ronon and thereby InSight, rather than against Beebe. Before I can grant summary judgment for Beebe, InSight claims, it must be given the opportunity to prove these contentions through the submission of evidence obtained after depositions are taken.

Very sensitive factual inquiries by the parties and the court will ensue if I adopt InSight's position. Rowland would properly be the subject of detailed questioning about what he knew about Stradley Ronon's role and when he gained that knowledge. It would be more than fair game to ask him what steps he took to learn about who was serving as local counsel in the Hercules Litigation. Because InSight has claimed that Rowland's bias, if any, was against Stradley Ronon, Beebe would be entitled to inquire about how Rowland dealt with situations involving friends and adversaries. Many people expect their friends to meet a higher standard, while treating adversaries with more than ordinary fairness and deference. By so acting—out of a desire to appear and in fact be fair—such people may subconsciously act in a biased fashion. In this regard, the questioning could extend to whether Rowland was worried about being perceived by InSight as biased, because he was ruling on their claims at the same time he was engaged in a fight with their lawyers.

Stradley Ronon and Reed Smith attorneys might also be fairly subjected to questioning about their respective roles in the Hercules Litigation, questioning that would almost certainly be the subject of claims of privilege. The Stradley Ronon lawyers would be asked how they could have signed two complaints on behalf of Rowland without knowing that they were doing so.[32]

At the end of this discovery process, there would most likely remain factual disputes precluding summary judgment. This would lead to a trial, after which I would be forced to make findings of fact about all these delicate issues and potentially ascribe fault to Rowland or Stradley Ronon in a normatively judgmental way.

The *Commonwealth Coatings* line of cases set forth a standard that minimizes the probability that such an unseemly and inefficient judicial proceeding would transpire. By requiring vacatur whenever an arbitrator fails to disclose a substantial relationship creating a reasonable impression of bias, these cases place a sensible limit on judicial involvement at the post-arbitration stage of a dispute.[33] Such lim-

---

**31.** Indeed, it is not uncommon for local counsel to play the dominant role.

**32.** *Cf.* Del.Super. Ct. Civ. R. 11.

**33.** I recognize that other authorities hold or imply that even if an undisclosed relationship creating a reasonable impression of arbitrator bias in fact existed, the party opposing vacatur must be given the opportunity to prove that the arbitrator did not know about the relationship. *E.g., Overseas Private Invest-*

*ment Corp. v. The Anaconda Co.,* 418 F.Supp. 107, 110–11 (D.D.C.1976) (if arbitrator did not know of facts creating reasonable impression of bias, vacatur is not required); *R.E. Bean Constr. v. Middlebury Assocs.,* 139 Vt. 200, 428 A.2d 306, 310 (1980) (same); *cf.* Proposed UAA Revisions § 9(d) & n. 4 (failure to disclose relationship creating reasonable impression of bias creates a presumption of evident partiality and implying that other party may rebut by showing that the award was

its advance the overall philosophy of the DUAA, which is to confine post-arbitration judicial review to narrow issues essential to the integrity of the arbitration process and to avoid post-arbitration trials to the extent consistent with justice.[34] If the parties are afforded the necessary information about possible conflicts by potential arbitrators, they will, in almost all cases, work the issue out themselves at the level most consistent with judicial economy.

The *Commonwealth Coatings* rule, if applied consistently, also yields results that are respectful of the contractual freedom the public policy favoring arbitration seeks to promote, especially the traditionally powerful role the parties play in selecting their own neutral arbitrators. To the extent that courts sanction the nondisclosure of potential conflicts by arbitrators, the courts will necessarily find themselves sucked into determining a much larger number of disputes about arbitrator bias. A strong pro-disclosure policy actually reduces the need for judicial involvement in arbitrator disqualification disputes because it empowers the parties to arbitrations to

deal with these issue themselves on an informed basis.[35] Disclosure "gives the parties, who are in the best position to judge an arbitrator's partiality, a chance to reject or accept an arbitrator with full knowledge of the arbitrator's connections." [36]

Requiring disclosure in these circumstances also promotes the pro-arbitration public policy reflected in the DUAA. Private parties will be more likely to choose to resolve their disputes in arbitration if they know that the DUAA requires that persons who hold themselves out as neutral arbitrators disclose potential conflicts. The limited judicial review of arbitration awards permitted by the DUAA is designed to ensure the basic fairness of the arbitration process. A party who suffers an adverse award at the hands of a supposedly neutral arbitrator who did not disclose a relationship creating a reasonable impression of bias is unlikely to come away from the experience with much respect for the arbitration process. Even if the award was just on its merits, the losing party will

not tainted by the nondisclosure). For all the reasons stated above, I believe that this is a road our courts should not pave, certainly not in this case, and I find far preferable the contrary approach taken by other courts. *See, e.g., Schmitz v. Zilveti*, 20 F.3d at 1046 (described in note 27, *supra* ). Here Rowland had a duty to avoid a relationship with Stradley Ronon. Commercial Arbitrator's Code, Canon I.D. Having not done that, he had a duty to discover and promptly disclose his relationship with Stradley Ronon. *Id.*, Canon II.B, II.C.

Any further probe into whether Rowland was actually influenced by a relationship creating a reasonable impression of bias would require me to engage in a finding more appropriate for a mind-reader than a judge. *Morelite*, 748 F.2d at 84 (recognizing difficulty, if not impossibility, of determining whether an arbitrator actually acted in a biased fashion). After all, no arbitrator in Rowland's position is likely to admit that he was influenced, one way or the other, by such an undisclosed relationship. Even those cases permitting discovery into the arbitrator's knowledge of the facts giving rise to an inference of bias recognize that once that knowledge is proven, it is inappropriate to inquire

whether the knowledge in fact affected the arbitrator's decisionmaking process. *E.g., Anaconda*, 418 F.Supp. at 110 (stating that "courts are unable to determine with any great degree of accuracy the subjective impact of knowledge on the human mind" and concluding that *Commonwealth Coatings* teaches that it is inappropriate for them to try).

34. *Cf. Wier*, mem. op. at 9–10, 1997 WL 74651, at *4, 1997 Del. Ch. LEXIS 17, at *13–14 (emphasizing the limited nature of judicial review under the DUAA); *Roberts v. Shelly's of Delaware, Inc.*, Del. Ch., C.A. No. 6801, letter op. at 11–12, 1982 WL 17827, at *4, 1982 Del. Ch. LEXIS 484, at *12–13, Hartnett, V.C. (1982) (same).

35. *Commonwealth Coatings*, 393 U.S. at 151, 89 S.Ct. 337 (White, J., concurring).

36. *Olson v. Merrill Lynch*, 51 F.3d at 160; *see also In re Sanko S.S. Co., Ltd.*, 495 F.2d 1260, 1264 (2d. Cir.1973) (requirement of disclosure reduces need for judicial involvement in arbitrator bias issues by enabling parties to address them as "architects of their own arbitration process").

harbor the thought that some illicit reason in part motivated the outcome.

Doubtless there are costs to this strong pro-disclosure approach. A robust policy in favor of disclosure will result in the vacation of arbitration awards that an omniscient factfinder could confidently (because she knows all) bless as untainted by bias and thus in the needless incurrence by the original prevailing parties of additional transaction costs and the risk of receiving different results in subsequent arbitrations. Nonetheless, the benefits of such a disclosure policy for contracting parties in the aggregate outweigh the possibility that injustice will result in particular cases. In this respect, it is noteworthy that the costs of a pro-disclosure rule in a specific case fall most heavily on the party in the best position to avoid paying those costs: the party with a relationship with the arbitrator. If such a party and its agent attorneys promptly disclose their relationships with an arbitrator, then that party can minimize, if not wholly eliminate, the risk of any later bias attack in court. But where, as here, that party's attorneys do not disclose such a relationship promptly, it is appropriate that the nondisclosing litigant, rather than its opponent left in the dark, bear the cost of its own agents' failure.

For all these reasons, it seems to me to be most consistent with the DUAA to follow the teaching of *Commonwealth Coatings* and vacate the award in this case. I might well find, after discovery or trial, that Rowland—an experienced Delaware attorney—was unaware that he was represented by Stradley Ronon as local counsel—in a case worth over $100,000 to him—during the time he was acting as an arbitrator—even though he had the duty and opportunity to obtain the necessary knowledge to make appropriate disclosure—and would appear to have had to avoid reading important documents to remain in a state of ignorance. I might also find that lawyers from Stradley Ronon filed two complaints on behalf of Rowland without recognizing that it was the same Rowland who was on the Arbitration Panel. Such findings could only be made after very intrusive and uncomfortable inquiries into the state of mind and conduct of an arbitrator and two law firms. The findings will probably hinge on determinations of credibility and therefore could most likely be made only after the expense and inefficiency of a post-arbitration trial.

Nor would such findings dispel Beebe's doubts about the integrity of the Arbitration. I daresay Beebe would always harbor some doubt about whether the process had been fair, even if it believed that I did my best in concluding that Rowland did not know about Stradley Ronon's role on his behalf and therefore could not have been biased for that reason.

■ In these circumstances, I conclude that Beebe has demonstrated evident partiality sufficient to require vacatur under § 5714(a)(2) of the DUAA. Where an arbitrator fails to disclose a relationship with a party or a party's attorney that creates a reasonable impression of bias, the party seeking vacatur should not bear the burden of demonstrating that the arbitrator was actually aware of that relationship.[37]

37. The Court of Appeals for the Ninth Circuit reached a similar conclusion in *Schmitz v. Zilveti*, 20 F.3d at 1046. In that case, an arbitrator failed to disclose that his law firm had represented the parent corporation of a party to the arbitration on at least 19 occasions over a 35–year period, most recently 21 months before arbitration commenced. The court held, per the majority and concurring opinions in *Commonwealth Coatings*, that evident partiality was demonstrated because the arbitrator's relationship created "a reason-able impression of partiality." *Id.* at 1045; see also *Commonwealth Coatings*, 393 U.S. at 149, 89 S.Ct. 337 (using phrase "create an impression of possible bias"); *id.* at 150–51, 89 S.Ct. 337 (White, J., concurring) (encouraging full disclosure but stating that vacatur was not required if an undisclosed relationship was "trivial" or "remote").

In such a circumstance, the court held that the party seeking vacatur need not prove that the undisclosed interest resulted in "actual bias" on the part of the arbitrator. *Zilveti* at

To conclude otherwise would encourage arbitrators to blind themselves to possible conflicts, increase this court's involvement in the arbitrator selection process, and undermine the integrity and reputation of arbitration as a dispute resolution mechanism.[38]

### V.

■ InSight argues that even if Rowland's relationship with Stradley Ronon would otherwise satisfy the evident partiality standard, I must defer to the AAA's April 14, 1998 letter reaffirming Rowland as an arbitrator after the relationship surfaced. According to InSight, Beebe waived its right to seek vacatur under § 5714(a)(2) by contracting for arbitration under the AAA Commercial Rules, because Rule 19 states that the AAA's determination on a bias claim "shall be conclu-

sive." InSight therefore contends that the AAA's decision on the bias issue is due the same deference as an award by an arbitrator.

In this case, I need not address whether private parties may, by explicit agreement, contract away their rights to judicial review under the DUAA.[39] Given Delaware's public policy favoring arbitration, this court would not lightly conclude that such private ordering is prohibited. Indeed, this court has generally confined itself to the record in determining whether an arbitration award should be vacated for one of the reasons in § 5714 of the DUAA and has been loathe to reexamine *de novo* the merits of arbitration decisions for which a rational explanation can be derived from the record.[40] This approach reflects the value our state places on contractual freedom by according respect to a decision by

1046. Like Rowland's obligations under Canon II of the Arbitrator's Code, the arbitrator in *Zilveti* was under a duty imposed by National Association of Securities Dealer Rules to identify and disclose relationships that could undermine his impartiality. Because the arbitrator failed to do so, vacatur was required. The arbitrator was deemed to have constructive knowledge of the relationship because the facts about the relationship were easily within his grasp. His failure to reach out and obtain them "resulted in a reasonable impression of partiality." *Id.* at 1049. In substantial part, the court premised its holding on the utility, per *Commonwealth Coatings*, of "giving arbitrators an incentive to be forthright with the parties, honestly disclosing what arbitrators might otherwise have an incentive to hide." *Id.* at 1048.

38. Because it is not necessary to the resolution of the case before me, I do not address the appropriate scope of discovery in a case where vacatur is sought because an arbitrator had an arguable conflict that she timely disclosed to the parties or where it is not clear without discovery that an undisclosed relationship is substantial enough to create a "reasonable impression of partiality ." I do note that the enforcement of a policy requiring prompt disclosure of potentially bias-creating relationships will provide parties who cannot agree on recusal or waiver as a solution to a potential conflict with the opportunity to create a reviewable record during the arbitration process. *Commonwealth Coat-*

*ings*, 393 U.S. at 152, 89 S.Ct. 337 (White, J., concurring). If such a record is created, review under § 5714(a)(2) of the DUAA can proceed in the more efficient and typical fashion.

39. The Proposed Revisions to the UAA, which in general attempt to accord even more contractual freedom to parties than does the current version provide that parties to an arbitration contract may not waive the provisions of the UAA (comparable to § 5714 of the DUAA) providing for limited post-arbitration judicial review, including review under the evident partiality standard. Proposed UAA Revisions §§ 27(b)(1), 19. But (somewhat contradictorily) the Proposed UAA Revisions appear to allow contracting parties to set higher or lower standards for arbitrator conflicts disclosure than is required by case law interpreting the evident partiality standard. *Id.* § 9(a) n. 3.

40. *See, e.g., Wier,* mem. op. at 16, 1997 WL 74651, at *7, 1997 Del. Ch. LEXIS 17, at *24 ("no *de novo* hearing is permitted to determine whether one of the five statutory exceptions [in § 5714] is applicable"); *DMS Properties–First, Inc. v. P.W. Scott Assocs., Inc.,* Del. Ch., C.A. No. 16450, mem. op. at 13–14 & n. 9, 1999 WL 1261335, at *4–5, 1999 Del. Ch. LEXIS 120, at *17–18, Strine, V.C. (June 21, 1999, rev. July 19, 1999) (where parties submitted issue of arbitrability to arbitrator, judicial review under § 5714(a)(5) of that issue should be confined to the record and defer-

private parties to resolve their disputes in a particular manner. As a result, there is some first-glance appeal to the argument that Beebe's decision to proceed under the AAA Commercial Rules should be construed as an agreement to accept a AAA ruling on bias and disqualification as having the same effect as that of an arbitrator.[41]

Upon a closer look, however, this argument loses its luster, because there is no reason to conclude that Beebe's acceptance of arbitration under the AAA Commercial Rules, including Rule 19, can be deemed a knowing contractual waiver of its right to an independent judicial determination under § 5714(a)(2). Courts that have examined the interplay of AAA Commercial Rule 19 and the evident partiality standard under the FAA and UAA have, without

any exception cited by InSight, concluded that "submission of [the arbitrator bias] issue to the AAA in accordance with Rule 19 in [no] way limits or bars a court from considering the issue when properly raised in a proceeding to vacate an award."[42] Indeed, "courts have required compliance with Rule 19 but only to preserve the evident partiality issue for judicial review; they do not hold that the AAA's determination of the issue is then binding on the court in a proceeding to vacate the award."[43] As early as 1946 a federal court held that a party that agreed to AAA arbitration was required to exhaust its remedies under the predecessor to AAA Commercial Rule 19 and participate in the arbitration if the AAA denied its challenge to the arbitrator. By so doing, however, the party did not waive its right to seek an independent ruling by the court on its post-arbitration, evident partiality claim.[44]

ence should be accorded to the arbitrator's decision).

**41.** There are at least two separate questions that must be asked about the appropriate method of review. First, should the review, whatever it is, be confined to the record made by the parties in the arbitration process or should it also involve a review of evidence developed through discovery in the post-arbitration litigation? Second, should the standard of review be a deferential one acknowledging the parties' voluntary choice to proceed under the AAA Commercial Rules or a *de novo* one implicitly based on the notion that the General Assembly intended this court to independently apply the vacatur factors in § 5714, regardless of any agreements between the parties to resolve issues involving those factors before an arbitrator or another "neutral" (such as the AAA) in the first instance?

**42.** *Boyhan v. Maguire,* 693 So.2d 659, 662 (Fla.Dist.Ct.App.1997) (a case arising under Florida's version of the UAA); *see also Britz v. Alfa–Laval Food & Dairy Co.,* 40 Cal.Rptr. 700, 710, 34 Cal.App.4th 1085, 1102 (5th Dist. 1995) (FAA required *de novo* review of evident partiality claim even where AAA refused to disqualify an arbitrator under its Rule 19), *modified reh'g denied,* 35 Cal.App. 4th 1212, *review denied,* 1995 Cal. LEXIS 4953 (Cal. Aug. 10, 1995), *cert. denied,* 516 U.S. 1072, 116 S.Ct. 774, 133 L.Ed.2d 726 (1996); *McKinney Drilling Co. v. Mach I Limited Part-*

*nership,* 32 Md.App. 205, 359 A.2d 100 (1976) (appearing to utilize *de novo* standard in analyzing whether there was evident partiality in case where the AAA had rejected a challenge to the neutrality of an arbitrator under the AAA's construction industry arbitration rules.) *Cf. Van Syoc v. Walter,* 259 N.J.Super. 337, 613 A.2d 490, 492 (App.Div.1992) (Without explaining its choice of this approach, the Appellate Division determined that trial court was correct in dismissing complaint seeking to enjoin an arbitration on the ground of arbitrator disqualification, because the trial court's conclusion that the AAA decision on the disqualification issue was not arbitrary or capricious was "fully supported by the record." The case did not arise in the post-arbitration context where the statutory evident partiality standard was implicated,), *cert. denied,* 133 N.J. 430, 627 A.2d 1136 (1993).

**43.** *Boyhan,* 693 So.2d at 662; *see also Health Services Management Corp. v. Hughes,* 975 F.2d 1253, 1263 (7th Cir.1992) (objector must "exhaust his remedies within the rules of the Association, but he will not be precluded from reasserting his objection, if necessary, when confirmation of the award of arbitrators comes before a proper judicial tribunal"); *see also* Proposed UAA Revisions § 9(e) ("If the parties to an arbitration proceeding agree to the procedures of an arbitration organization [such as the AAA] or any other procedures for pre-award challenges to arbitrators, substantial compliance with those procedures is a condition precedent to a motion to vacate on those grounds under [the evident partiality standard in] Section 20(a)(2).")

The case law therefore suggests at best that Beebe was binding itself to exhaust its AAA remedies and complete the arbitration before raising the bias issue under the DUAA. In light of such cases, it is notable that the AAA has not amended Rule 19 to specifically state that an agreement to arbitrate under the AAA Commercial Rules constitutes an agreement to accept the AAA's determination of a bias issue as having the force of an arbitral decision and thereby the corresponding effect of precluding independent judicial review. I therefore conclude that Beebe cannot be said to have knowingly waived its statutory right to a *de novo* determination of the bias issue in this court by presenting its objection to Rowland in the first instance to the AAA under its Rule 19. Thus the AAA's ruling is not a bar to an independent judicial examination.

■ Alternatively, I conclude that AAA's decision cannot withstand even the deferential scrutiny given to arbitration awards under the DUAA. Although it is true that this court will not set aside an arbitrator's decision simply because the arbitrator articulates no basis for her decision, this court will vacate an arbitration decision where the decision is in "manifest disregard" of the law or "where the record reveals no support whatsoever for the decision ." [45]

The AAA was required by its own policies to apply its Rule 19 and the Commercial Arbitrator's Code. Both are consistent with the pro-disclosure policy articulated in *Commonwealth Coatings;* indeed, the Code's pertinent provisions are drawn in large measure from the principles articulated in Justice White's concurrence in that case. Yet there is no basis for me to conclude that the AAA applied these pertinent authorities, which its own policies regard as authoritative.

Rule 19 and the Commercial Arbitrator's Code together imposed on Rowland an affirmative obligation to avoid and, failing that, discover and disclose his relationship with Stradley Ronon. How did the AAA satisfy itself that Rowland had discharged these obligations? Did the AAA conclude Rowland had no obligation to determine who was representing him in the Hercules Litigation as local counsel? Did the AAA conclude that Rowland did not receive and read the November 12, 1996 *pre-Arbitration* communication from the Hercules Litigation plaintiffs' steering committee identifying Stradley Ronon as his counsel?

The AAA offered Beebe no opportunity to probe these issues.[46] The AAA held no hearing despite the fact-intensive nature of the bias issue. The AAA never told the parties who resolved the bias question or why.

It is difficult to conceive how the AAA could have determined that Rowland's continued service was proper under Rule 19 or the Commercial Arbitrator's Code without conducting a factual inquiry.[47] One

**44.** *San Carlo Opera Co. v. Conley*, 72 F.Supp. 825, 833 (S.D.N.Y.1946), *aff'd* 163 F.2d 310 (2d Cir.1947).

**45.** *Wier*, mem. op. at 9, 1997 WL 74651, at *2, 1997 Del. Ch. LEXIS 17, at *14; *see also Falcon Steel Co., Inc. v. HCB Contractors, Inc.*, Del. Ch., C.A. No. 11557, mem. op. at 5, 1991 WL 50139, at *2, 1991 Del. Ch. LEXIS 69, at *4, Hartnett, V.C. (Apr. 4, 1991).

**46.** *Compare* AAA Commercial Rules 33–34 (according the parties the right to submit evidence to support their positions).

**47.** As mentioned previously, the AAA itself has filed a motion for a protective order to stop any inquiry into its decisionmaking process. I agree with the AAA that it is generally unwise to permit such discovery. In the ordinary case, the procedural fairness of the arbitration process (e.g., that parties were afforded the opportunity to present their case and to challenge the evidence presented against them) is obvious. That is not so here. The record created by the AAA in this case suggests that it gave short shrift to Beebe's concern and that it made a factual determination without providing Beebe with an opportunity to develop and present relevant evidence of

can understand how the AAA could have reached the contrary conclusion without a hearing, given the undisputed fact that Rowland did not disclose his relationship with Stradley Ronon in a prompt manner or even later when his knowledge of the relationship must be acknowledged by In-Sight. In its papers supporting its motion to quash discovery, the AAA contends that there was an adequate factual basis for its decision on the bias issue. The only "facts" or "evidence" cited by the AAA in its submissions, however, is the hearsay in Ms. Gray's March 20, 1998 letter, which contains factual assertions that are, frankly, difficult to reconcile with the course of events in the Arbitration and the Hercules Litigation. In any case, it hardly seems "neutral" for the AAA to resolve a sensitive and fact-intensive matter without conducting a hearing and instead by adopting wholesale the view of the facts advocated by one of the parties' attorneys in a letter based on that attorney's second or third-hand knowledge. And if the AAA engaged in a fact-finding inquiry secretly, without according the parties the opportunity to participate, that method of decisionmaking in itself renders the decision subject to vacatur.[48]

In these circumstances, where the AAA did not offer Beebe a hearing[49] and there is strong evidence suggesting that Rowland did not fulfill his disclosure duties under *Commonwealth Coatings,* Rule 19, and Canons I and II of the Commercial Arbitrator's Code, the AAA's failure to explain its decision or who made it bolsters the conclusion that the decision should be vacated.[50] While I reject InSight's argument in this respect, I do not mean to discourage the AAA from more clearly specifying Rule 19's effect on contracting parties' rights to seek independent judicial review of bias issues. But if the AAA wants its own deliberative process to be accorded the same deference given to arbitrations generally, that process should be one that provides the same guarantees of fairness. At the very least, the AAA should disclose what its process entails, so that parties know the bargain they are making.

its own or to contest InSight's factual allegations.

It also strikes me as somewhat odd that the AAA and Rowland joined forces and hired the same attorney to thwart discovery into the bias issue. At least one court has concluded that the AAA's pecuniary and reputational concerns over the possible implications of a mid-arbitration disqualification of one of its arbitrators presented the possibility for a conflict of interest and that such a conflict helped justify the court's decision to review an evident partiality claim on a *de novo* basis. *Britz,* 34 Cal.App. 4th at 1102, 40 Cal.Rptr. at 710; *see also* AAA Commercial Rule 53(d) (compensation agreements of neutral arbitrator "shall be made through the AAA and not directly between the parties and the arbitrator").

**48.** This is what InSight's attorney suspects is in fact the case. *Cf.* AAA Commercial Rule 33(a) ("All evidence shall be taken in the presence of . . . all of the parties, . . . ."); Rule 35 ("An arbitrator finding it necessary to make such an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. Any party who so desires may be present at such an inspection or investigation."); 10 *Del. C.* § 5714(a)(4) (vacatur is proper where the "arbitrators . . . refused to hear evidence material to the controversy . . ., so as to prejudice substantially the rights of a party, . . . .").

**49.** I acknowledge that Beebe could have been more forceful and demanded such a hearing. Given the time pressures Beebe faced, the sensitivity of attacking a panel member's neutrality in the face of a pending damages hearing, the AAA's failure to answer Beebe's question about the Panel's vote, and the intensely factual nature of the issue at stake, however, Beebe's lack of assertiveness does not excuse the AAA's approach to resolving such an important issue affecting substantial rights of the parties.

**50.** *See Wier,* mem. op. at 9, 1997 WL 74651, at *4, 1997 Del. Ch. LEXIS 17, at *14 ("where the record reveals no support whatsoever for the determination made by the arbitration panel, the award must be vacated"); *cf. Malekzadeh v. Wyshock,* Del. Ch., 611 A.2d 18, 22 (1992) (arbitration decision unaccompanied by explanation will be upheld if "grounds for the award can be inferred from the facts of the case").

## VI.

For the foregoing reasons, Beebe's motion for summary judgment is hereby GRANTED and the Arbitration Award is hereby VACATED. InSight's motion for summary judgment is hereby DENIED.

The remaining discovery motions are DENIED as moot.

IT IS SO ORDERED.