**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LORI W. WILL
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: March 16, 2023
Date Decided: June 30, 2023

Richard L. Renck, Esquire
Mackenzie M. Wrobel, Esquire
Tracey E. Timlin, Esquire
Duane Morris LLP
1201 N. Market Street
Wilmington, Delaware 19801

Richard D. Heins, Esquire
Tiffany Geyer Lydon, Esquire
Ashby & Geddes, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19801

> RE: *Huntington Way Associates, LLC v. RRI Associates LLC, et al.*,
> C.A. No. 2022-0761-LWW

Dear Counsel:

I write regarding the cross-motions for summary judgment pending in this action. The plaintiff's motion seeks confirmation of an arbitration award; the defendants' motion asks that the award should be vacated. For the reasons explained below, the plaintiff's cross-motion is granted and the defendants' cross-motion is denied.

## I. BACKGROUND

Plaintiff Huntington Way Associates, LLC, as successor in interest to Whippoorwill Farm Associates, LLC, f/k/a Kingfish RRI LLC ("Kingfish"), is a member of nominal defendant WRRH LLC (the "Company"). The Company

operates the Red Roof Inn brand of hotels.[1] Defendants RRI Associates LLC and WB-US Enterprises, Inc. (together, the "Westmont Members") are affiliates of Westmont Hospitality Group ("Westmont")—one of the world's largest privately held hospitality businesses.[2] WB-US Enterprises, Inc. is the Company's Managing Member.

## A. The LLC Agreement

On January 1, 2011, the parties and non-party Madison Ave II LLC entered into an Amended and Restated Limited Liability Company Agreement of WRRH LLC (the "LLC Agreement").[3] The LLC Agreement sets out the rights and obligations of the Company's members. It provides Kingfish with several put options exercisable upon the occurrence (or non-occurrence) of specific events.[4]

The "First Put Option" grants Kingfish "the right to deliver to the Westmont Members a notice stating that [Kingfish] exercises its right to sell fifty percent (50%) of the aggregate Original Interests of [Kingfish] to the Westmont

---

[1] *See* Transmittal Aff. of Tracey E. Timlin in Supp. of Pl.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss, or in the Alternative, Stay Proceedings (Dkt. 15) ("Timlin Aff.") Ex. 1 ("Final Award") ¶ 10.

[2] *Id.* ¶ 13.

[3] Timlin Aff. Ex. 2 ("LLC Agreement").

[4] *Id.* §§ 10.18, 10.20, 10.22.

Members."[5]  If Kingfish were to timely deliver the put notice, the "Westmont Members w[ould] be required to purchase" and Kingfish would be "required to sell" these interests.[6]

An appraisal process to determine the Company's fair market value for purposes of the First Put Option is detailed in Exhibit A to the LLC Agreement.[7] The process begins with each side appointing a "Qualified Appraiser" to prepare a valuation of the Company.  If the higher valuation were more than 115% of the lower, a third Qualified Appraiser would be appointed and instructed to "fairly and impartially determine the [fair market value] of the Company" within the other two valuations.[8]  The third Qualified Appraiser's valuation would be deemed the final and binding fair market value of the Company.

The LLC Agreement also addresses the Managing Member's duties and obligations.  The Managing Member is to "act in the best interests of the Company" and not take "any action with respect to the Investments or the

---

[5] *Id.* § 10.18(a).  The First Put Option would be triggered "[i]n the event that the Members do not sell the Company, Red Roofs Inns, Inc. and/or substantially all of the Red Roof business platform on or before January 1, 2019." *Id.*

[6] *Id.* § 10.18(b).

[7] *Id.* at Ex. A.

[8] *Id.* at Ex. A-1.

Company (whether directly or indirectly) which is intended to favor it, its Affiliate's or any other Person's interests over the interests of the Members."[9] The LLC Agreement further provides that "whenever a potential conflict of interest exists or arises between the Managing Member on one hand, and the Company or any Member . . . on the other hand," the resolution must be "fair and reasonable to the Company" and not favor the Managing Member or Westmont Members.[10]

In addition, the LLC Agreement addresses the resolution of "[a]ny dispute, controversy or claim between the Members arising from or in connection with" the contract.[11] Any such dispute would be "submitted to, and finally determined by, arbitration in accordance with the dispute resolution procedures" set forth in Schedule 10.14 to the LLC Agreement.[12] Schedule 10.14 specifies that the arbitration would be conducted by the American Arbitration Association in accordance with the AAA Commercial Rules (the "AAA Rules").[13]

---

[9] *Id.* § 4.8.2.

[10] *Id.* § 4.7.1.

[11] *Id.* § 10.14.

[12] *Id.*

[13] *Id.* at Sched. 10.14(a).

### B.  The Disputes

On December 3, 2019, Kingfish delivered to the Westmont Members its notice exercising the First Put Option pursuant to Section 10.18 of the LLC Agreement.[14]  Kingfish appointed FTI Consulting as its Qualified Appraiser.  The Westmont Members appointed Ernst & Young.[15]  After several extensions of the appraisal process, the Westmont Members ceased communication with Kingfish.[16]  Kingfish contends that doing so breached the Westmont Members' obligation to engage in the appraisal process and close on their acquisition of the interests.[17]  This dispute is referred to in the parties' papers as the "First Put Option Claims."

Separately, Kingfish accused the Managing Member of misusing corporate assets solely to benefit its Westmont affiliates.[18]  The Managing Member purportedly caused its wholly owned subsidiary to guarantee hundreds of millions of dollars in loans to the Managing Member's Westmont affiliates for projects

---

[14] Final Award ¶ 113.

[15] *Id.* ¶¶ 114, 115.

[16] *Id.* ¶ 115.

[17] Pl.'s Opening Br. in Supp. of Mot. for Summ. J. to Confirm AAA Arb. Award (Dkt. 17) ("Pl.'s Opening Br.") 6-7; *see* Final Award ¶ 115.

[18] Pl.'s Opening Br. 7.

unrelated to the Company or the Red Roof Inn business.[19] This dispute is referred to as the "Wrongful Guarantee Claims."

### C.    The Arbitration

On October 23, 2020, Kingfish filed a Demand for Arbitration with the AAA in connection with the First Put Option Claims and Wrongful Guarantee Claims.[20] The arbitral panel (the "Tribunal") was constituted soon after. Its Chair was an attorney who serves as a Senior International Arbitration Advisor at a major law firm.[21] The other two members of the panel are both experienced arbitrators and lawyers by training.[22]

The parties engaged in a three-day hearing before the Tribunal on October 25 to 26 and December 3, 2021.[23] The hearing included testimony on the issues of liability, damages, and valuation—including testimony from FTI and Ernst & Young. The tribunal served as the third Qualified Appraiser for purposes of completing the appraisal process detailed in the LLC Agreement.[24] At the

---

[19] *Id.*; Final Award ¶¶ 118-19.

[20] Final Award ¶ 34.

[21] *See id.* ¶ 5.

[22] *See id.*

[23] *Id.* ¶¶ 77-79, 84-90.

[24] *Id.* ¶¶ 74-75, 84-90.

conclusion of the hearing, the parties were invited to provide additional expert submissions and post-hearing briefs, which were submitted in January and February 2022.[25] Proceedings were closed in July.[26]

### D. The Final Award

On August 5, 2022, the Tribunal issued its Final Award in a 91-page decision.[27] It found the Westmont Members liable on the First Put Option Claims and the Wrongful Guarantee Claims.

With respect to the First Put Option Claims, the Tribunal concluded that the Westmont Members "breached the [LLC] Agreement by failing to perform their obligations [with] respect to the First Put Option process set out at Section 10.18."[28] In so doing, the Tribunal considered and rejected the Westmont Members' argument that Kingfish was not entitled to relief because it violated the required appraisal process.[29] The Tribunal similarly considered and rejected the

---

[25] *Id.* ¶¶ 105-07.

[26] *Id.* ¶ 108.

[27] *See id.* at Cover Page.

[28] *Id.* ¶ 186.

[29] *Id.* ¶ 185.

Westmont Members' argument that the COVID-19 pandemic frustrated the LLC Agreement and excused their non-performance.[30]

The Tribunal went on to determine the Company's fair market value to calculate the amount Kingfish was owed for the First Put Option Claims.[31] Acting as the third Qualified Appraiser, the Tribunal reiterated its duty to "fairly and impartially determine the FMV of the Company," subject to the LLC Agreement's requirement that "the [t]hird Qualified Appraiser's determination [be] between the determinations of the other two Qualified Appraisers."[32] The Tribunal evaluated the arguments and evidence on the Company's fair market value, adopting certain aspects of each appraisal.[33] The Tribunal concluded that the Company's fair market value was $316,274,185.[34] It then applied the formula in Section 10.18 of the LLC Agreement to calculate the amount the Westmont Members were

---

[30] *See id.* ¶¶ 187-206.

[31] *See id.* ¶¶ 254-94.

[32] *Id.* ¶ 256.

[33] *Compare id.* ¶¶ 270-71 *with* ¶¶ 286-87.

[34] *Id.* ¶ 294.

obligated to pay Kingfish.[35]    The Tribunal determined that amount was $24,155,495.[36]

With respect to the Wrongful Guarantee Claims, the Tribunal found that the Westmont Members "breached the [LLC] Agreement by using the Company and its assets to guarantee loan obligations relating to projects in which the Westmont Members had interests wholly independent of the Company and which created financial risk to the Company."[37]  In doing so, it rejected the Westmont Members' argument that the loan guarantees fell within the Managing Member's discretion.[38] The Tribunal also rejected the Westmont Members' argument that the loan guarantees provided a benefit to the Company, calling it "wholly inadequate to justify their self-serving conduct."[39]  The Tribunal ordered the Westmont Members to "either terminate all guarantees in violation of the [LLC] Agreement or provide collateral or surety in favor of [Kingfish] at the amount currently owed on each of the guaranteed loans."[40]

---

[35] *See* LLC Agreement § 10.18(b)(i).

[36] Final Award ¶ 294.

[37] *Id.* ¶ 217.

[38] *Id.*

[39] *Id.* ¶ 219.

[40] *Id.* ¶ 298; *see id.* at ¶ 316(d).

The Tribunal determined that an award of pre- and post-judgment interest to Kingfish was appropriate.[41]  Finally, the Tribunal awarded Kingfish 75% of its fees and costs associated with the arbitration.[42]

### E.    The Litigation

On August 22, 2022, the Westmont Members filed a placeholder "Preliminary Memorandum" in the United States District Court for the Southern District of Ohio.[43]  The Preliminary Memorandum stated that the Westmont Members were challenging the Tribunal's valuation of the Company in connection with the First Put Option and the award of interest, fees, and costs.[44]

Four days later, on August 26, Kingfish filed a Verified Complaint to Confirm Arbitration Award in this court.[45]  The Westmont Members subsequently moved to dismiss, or alternatively to stay, this proceeding in favor of the first-filed Ohio action.[46]

---

[41] *Id.* ¶¶ 299-306.

[42] *See id.* ¶¶ 307-15.

[43] *See* Timlin Aff. Ex. 4.

[44] *Id.* at 2-3.

[45] Dkt. 1.

[46] *See* Dkt. 13.

The parties filed cross-motions for summary judgment.[47]  The motions were argued on December 14 and taken under advisement at that time.[48]  The parties subsequently informed me that the Ohio action had been stayed pending the resolution of this action.[49]  The Ohio court's decision rendered the motion to dismiss moot.[50]  My decision on the cross-motions for summary judgment follows.

## II.    ANALYSIS

Summary judgment is appropriate under Court of Chancery Rule 56 where "there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law."[51]  "A summary judgment motion 'provides an appropriate judicial mechanism for reviewing an arbitration award, because the complete record is before the court and no *de novo* hearing is permitted.'"[52]

---

[47] *See* Dkts. 16, 49.

[48] *See* Dkt. 62.

[49] Dkt. 66 Ex. A.

[50] Dkt. 67.

[51] Ct. Ch. R. 56(c).

[52] *MHP Mgmt., LLC v. DTR MHP Mgmt., LLC*, 2022 WL 2208900, at *2 (Del. Ch. June 21, 2022) (quoting *Wier v. Manerchia*, 1997 WL 74651, at *7 (Del. Ch. Jan. 28, 1997), *aff'd*, 700 A.2d 736 (Del. 1997)), *aff'd*, 291 A.3d 1089 (Del. 2023) (TABLE).

"An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."[53] Where, as here, the parties did not designate the Delaware Uniform Arbitration Act as governing their arbitration, the Federal Arbitration Act (FAA) applies.[54]

Section 9 of the FAA requires a presiding court to confirm an arbitration award if confirmation is sought within a year, absent enumerated grounds for vacatur, modification, or correction.[55] Section 10 provides that a court may "make an order vacating the award upon the application of any party to the arbitration."[56] Section 10(a)(4) further instructs that vacatur may be sustained "where the

---

[53] *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974).

[54] 10 *Del. C.* § 5702(c) ("Unless an arbitration agreement complies with the standard set forth in subsection (a) of this section for the applicability of the Delaware Uniform Arbitration Act, any application to the Court of Chancery to enjoin or stay an arbitration, obtain an order requiring arbitration, or to vacate or enforce an arbitrator's award shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act."); *see Gulf LNG Energy, LLC v. Eni USA Gas Mktg., LLC*, 242 A.3d 575, 579 n.11 (Del. 2020).

[55] 9 U.S.C. § 9 ("If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.").

[56] 9 U.S.C. § 10(a).

arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."[57]

A party seeking to vacate an arbitration award under Section 10(a)(4) "bears a heavy burden."[58]  In *Auto Equity Loans of Delaware v. Baird*, the Delaware Supreme Court explained that "an arbitrator exceeds his powers" under Section 10 "when he acts in manifest disregard of the law."[59]  "To act in manifest disregard of the law, the arbitrator must be 'fully aware of the existence of a clearly defined governing principle but refuse[] to apply it, in effect, ignoring it.'"[60]  Vacatur is only available where "'the arbitrator (1) knew of the relevant legal principle,

---

[57] *Id.* § 10(a)(4).

[58] *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013); *see also Carl Zeiss Vision, Inc., v. Refac Hldgs., Inc.*, 2017 WL 3635568, at *1 (Del. Ch. Aug. 24, 2017) (characterizing an attempt to vacate an arbitration award as a "nearly vertical mountain" to climb).

[59] 232 A.3d 1293, 2020 WL 2764752, at *3 (Del. 2020) (TABLE).

[60] *Id.* (quoting *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014)); *see also Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp.*, 751 A.2d 426, 441 (Del. Ch. 1999) (noting that "this court will not set aside an arbitrator's decision simply because the arbitrator articulates no basis for her decision" but "will vacate an arbitration decision where the decision is in 'manifest disregard' of the law or 'where the record reveals no support whatsoever' for the decision" (quoting *Wier*, 1997 WL 74651, at *4)); *accord Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d. Cir. 2003) ("A party seeking vacatur bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it.").

(2) appreciated that this principle controlled the outcome of the disputed issue, and (3) nonetheless willfully flouted the governing law by refusing to apply it.'"[61]

### A. The Defendants' Manifest Disregard of the Law Arguments

The Westmont Members argue that the Tribunal manifestly disregarded the law in four ways. They say that the Tribunal: (1) "abdicated" its duties as the third Qualified Appraiser under the LLC Agreement; (2) disregarded a contractually mandated interest-free payment schedule; (3) inappropriately awarded costs; and (4) violated tax law in declining to account for certain tax liabilities.[62] None of these arguments amounts to a manifest disregard of the law that supports vacating the Final Award.

#### 1. Role as the Third Qualified Appraiser

The defendants aver that the Tribunal failed to assume the role of the third Qualified Appraiser contemplated by the LLC Agreement.[63] As discussed above,

---

[61] *MHP Mgmt.*, 2022 WL 2208900, at *3 (quoting *Agspring v. NGP X US Hldgs., L.P.*, 2022 WL 170068, at *3 (Del. Ch. Jan. 19, 2022)); *see SPX Corp.*, 94 A.3d 745, 747 (Del. 2014) ("To vacate an arbitration award based on 'manifest disregard of the law,' a court must find that the arbitrator consciously chose to ignore a legal principle, or contract term, that is so clear that it is not subject to reasonable debate.").

[62] *See* Combined Answering Br. in Opp'n to Pl.'s Mot. for Summ. J. to Confirm AAA Arb. Award & Opening Br. in Supp. of Defs.' Cross-Mot. for Summ. J. to Vacate the Award (Dkt. 49) ("Defs.' Answering Br.") 16, 22, 26.

[63] *Id.* at 16.

the LLC Agreement states that "[t]he third Qualified Appraiser shall be instructed to fairly and impartially determine the FMV of the Company."[64] The defendants argue that the Tribunal ignored this requirement because it "wholesale" adopted the valuation of the Company's primary asset—the Red Roof Inn franchise business—proffered by FTI.[65] In the defendants' view, the LLC Agreement required the Tribunal to conduct an independent valuation rather than compare the relative merits of the parties' valuations.

This court does "not sit as an appellate authority reviewing arbitrators' independent view of and application of the law to the facts."[66] Rather, its role is necessarily and appropriately limited. Where an arbitrator's decision turns on the interpretation of a contract, the court must determine whether the decision "draws its essence from the contract."[67] "The only question for the court 'is whether the

---

[64] *See* LLC Agreement Ex. A at A-1; *see also* Final Award ¶¶ 29, 68-75.

[65] Defs.' Answering Br. 16.

[66] *State Farm v. Clark*, 1999 WL 669366, at *2 (Del. Ch. Aug. 18, 1999).

[67] *United Paperworks Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 29 (1987) ("As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the court cannot overturn his decision simply because it disagrees with his factual findings, contract interpretations, or choice of remedies.").

arbitrator (even arguably) interpreted the parties' contract, not whether he got its

meaning right or wrong.'"[68]

It is evident that the Tribunal interpreted the LLC Agreement. The Final

Award states that:

> [T]he parties have agreed that if the Tribunal does not grant the primary relief sought by either Claimant or Respondents with respect to the First Put Option claim and does not adopt the valuation report submitted by either side on the First Put Option claim, the parties have authorized the Arbitral Tribunal to act as the third Qualified Appraiser under the Agreement for the purposes of valuing the First Put Option. The Agreement requires the Tribunal to determine the FMV of assets in which WRRH LLC has an ownership interest through Red Roof Inns, Inc. In its capacity as the third Qualified Appraiser, the Tribunal has to undertake valuation of several components including: Valuation of the Franchise Company; Valuation of the St. Clair Hotel (the parties have agreed on the value for other real properties); Valuation of the R&R Shares; and Net Working Capital.
>
> Exhibit A of the Agreement further provides that the "third Qualified Appraiser shall be instructed to fairly and impartially determine the FMV of the Company, provided however, that the third Qualified Appraiser's determination must be between the determinations of the other two Qualified Appraisers." Therefore, acting as the third Qualified Appraiser, the Tribunal must arrive at an FMV determination that is within the appraisal determinations of FTI (Claimant's appraiser) and EY (Respondents appraiser).[69]

---

[68] *MHP Mgmt.*, 2022 WL 2208900, at *3 (quoting *Oxford Health Plans LLC*, 569 U.S. at 569).

[69] Final Award ¶¶ 255-56.

Even if I looked beyond the fact that the Tribunal interpreted the LLC Agreement's terms, I could not conclude that the valuation runs afoul of a governing contractual provision. Nothing in the LLC Agreement specifies a particular valuation methodology. It does not, for example, require that the third Qualified Appraiser follow something akin to this court's statutory appraisal procedure.[70] Instead, the LLC Agreement specifies that the third Qualified Appraiser's valuation must be "between the determinations of the other two Qualified Appraisers."[71]

After "consider[ing] the evidence of both parties" the Tribunal decided not to "adopt the full valuation submitted by either" side.[72] The Tribunal found that FTI's methodology was appropriate and "that the assumptions underlying FTI's analysis [were] more reasonable than those underlying [Ernst & Young]'s analysis."[73] The Tribunal therefore adopted "a valuation approach similar to that

---

[70] *See, e.g.*, *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7-8 (Del. Ch. Nov. 2, 1995) (rejecting a party's challenge to a contractual valuation process—specifically, party's effort to impose a requirement of the Section 262 process—where the party did not "cite any . . . provision of the [a]greement that creates a contractual duty to conduct the valuation inquiry in a particular manner").

[71] LLC Agreement Ex. A at A-1; *see also* Final Award ¶ 256.

[72] Final Award ¶ 270.

[73] *Id.*

proposed by FTI."[74]   I cannot conclude that "the record reveals no support whatsoever" for the Tribunal's decision such that it is worthy of vacatur.[75]

### 2.    Pre- and Post-Judgment Interest

Next, the defendants assert that the Tribunal exceeded its authority when it awarded pre- and post-judgment interest "without any reference to the [LLC] Agreement's unequivocal provision that provides for payment in three equal installments over a two-year, interest-free period."[76]   The defendants are referring to Sections 10.18(b)(ii) and (b)(iii) of the LLC Agreement, which set an interest-free payment schedule for the purchase of Kingfish's interests.[77]   These provisions might have applied in the normal course had the Westmont Members followed the procedure mandated by the LLC Agreement.   But they did not; the dispute resolution provisions were consequently triggered.

The LLC Agreement's dispute resolution provisions contemplate an award of fees and costs.   Schedule 10.14 states that "[i]f deemed appropriate by the Arbitrator(s), the non-prevailing party shall pay any administrative fee, any

---

[74] *Id.* ¶ 271.

[75] *Beebe Med. Ctr.*, 751 A.2d at 441.

[76] Defs.' Answering Br. 22.

[77] LLC Agreement § 10.18(b)(ii)-(iii).

compensation of the Arbitrators and any expenses of any witnesses or proof produced at the direction of the Arbitrator(s)."[78]  Schedule 10.14 also permits an award of "fees and expenses (including fees and expenses of counsel and accountants, and travel, lodging and meal expenses) incurred in connection" with the dispute by the prevailing party.[79]

Schedule 10.14 to the LLC Agreement further provides that any arbitration would be conducted under the AAA Rules.  The Tribunal looked to Rule 47 of the AAA Rules, which makes interest a matter of discretion for an arbitrator.[80]  In exercising that discretion, the Tribunal "note[d] the significant passage of time since [Kingfish] exercised its right to the First Put Option in 2019."[81]  The Tribunal also cited to Delaware law, as instructed by the LLC Agreement's dispute resolution provisions.[82]  In doing so, the Tribunal set interest at 5.25%—the statutory rate in effect at the time of the parties' post-hearing submissions.[83]

---

[78] *Id.* Sched. 10.14(j).

[79] *Id.* Sched. 10.14(k).

[80] Final Award ¶ 299.

[81] *Id.* ¶¶ 303-06.

[82] *See id.* ¶¶ 299-306.

[83] *Id.* ¶¶ 300-06, 316(e)-(f); *see* LLC Agreement § 10.4; *see also* 6 *Del. C.* § 2301(a).

I see no basis to disturb the Tribunal's interpretation of the LLC Agreement, its application of the AAA Rules and substantive law, or its assessment that an award of interest was appropriate. The Tribunal's decision flouts neither governing principles of law nor the operative contract.

### 3. Arbitrator Fees and Expenses

The defendants similarly maintain that the Tribunal's award of costs violated the LLC Agreement. This argument is deficient.

The defendants acknowledge that the Tribunal had the discretion under the AAA Rules to order a party to bear fees and costs where the Tribunal was acting in an arbitral role.[84] They argue that the Tribunal lacked discretion to do so for the time it spent serving as the third Qualified Appraiser because the LLC Agreement states the third Qualified Appraiser's costs would be shared equally.[85]

This may have been the case if the Westmont Members complied with their obligations regarding the First Put Option. But there is nothing in the LLC Agreement requiring the parties to split a third Qualified Appraiser's costs during arbitration. In fact, Schedule 10.14 explicitly provides that costs and fees may be

---

[84] *See* Defs.' Answering Br. 26.

[85] *See* LLC Agreement Ex. A at A-1 ("For any [t]hird Qualified Appraiser, the Managing Member and the Kingfish Member shall share its fees and expenses equally.").

awarded at the discretion of the Tribunal.[86]  As a result, the Tribunal's decision to order the Westmont Members to pay its fees and costs was not in manifest disregard of the law or the LLC Agreement.

4.    Tax Liability

The defendants' final argument in support of vacatur is that the Tribunal failed to discount its fair market value determination by the tax liability that would have arisen in an actual sale of the Company.  The defendants contend that doing so "constituted a manifest disregard of well-established tax law."[87]  The defendants then proceed to dissect how the Tribunal arrived at the First Put Option's value and ask the court to do the same.

This is precisely the sort of reworking that the court will not conduct on a vacatur motion.  Relabeling a disagreement with an arbitrator's valuation as a manifest disregard of the law does not permit me to proceed otherwise.

The parties presented their positions on valuation to the Tribunal.  After consideration, the Tribunal found Kingfish's position was "more persuasive than the argument with respect to a potential valuation deduction for taxes advanced by

---

[86] *See id.* Sched. 10.14(j)-(k).

[87] Defs.' Answering Br. 27.

[the Westmont Members]."[88]  It further noted "that [the Westmont Members] did not offer any expert evidence on the issue."[89]

It is not for me to second guess how the Tribunal weighed evidence.  It considered the dispute and disagreed with the Westmont Members' position, noting a lack of evidentiary support.  Doing so does not amount to a clear refusal to apply a governing principle of tax law.

### B.    The Defendants' Mootness Argument

Additionally, the defendants assert that the portion of the Final Award addressing the Wrongful Guarantee Claims should not be confirmed because it is moot.  They argue that "Westmont has fully satisfied the Award's requirements with respect to the relief granted on the loan guarantees" because it "either removed the guaranty by having the loan paid off in full, provided a substitute guaranty, or provided indemnity in favor of Kingfish up to the amount of the loan obligation."[90]

Kingfish disputes the mootness of the relief it was granted for the Wrongful Guarantee Claims.  It asserts that the Westmont Members acknowledge certain

---

[88] Final Award ¶ 293.

[89] *Id.*

[90] Defs.' Answering Br. 30; *see id.* Ex. B.

actions required by the Wrongful Guarantee Claims portion of the Final Award have yet to be taken. For example, the Westmont Members say that their compliance with aspects of the Final Award is "imminent."[91]

Regardless, the defendants' argument does not moot the issue of confirmation (or alternatively, vacatur).[92] My role is not to police whether the Final Award has been complied with by the defendants; it is to confirm (or reject) the Final Award's validity. That issue is not moot.

## III. CONCLUSION

For the above reasons, Kingfish's cross-motion for summary judgment to confirm the Final Award is granted. The defendants' cross-motion for summary judgment to vacate the Final Award is denied.

Sincerely yours,

*/s/ Lori W. Will*

Lori W. Will
Vice Chancellor

---

[91] *See id.* Ex. B at 1-3.

[92] *E.g.*, *Teamsters Local 177 v. United Parcel Serv.*, 966 F.3d 245, 251-53 (3d Cir. 2020) (rejecting an argument that compliance with an award precluded confirmation and explaining that "[u]nder the FAA a party's injuries are only fully remedied by the entry of a confirmation order"); *Schusterman v. Mazzone*, 2019 WL 2547142, at *4 (S.D.N.Y. June 19, 2019) (finding that the payment of an award balance "does not negate the right of the prevailing party . . . to seek judicial confirmation of the arbitral decision").