IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FORTIS ADVISORS, LLC, solely in its capacity as Seller Representative, | § § § § | No. 162, 2025 |
| Plaintiff Below, Appellant, | § § § | |
| v. | § § | Court Below: Court of Chancery of the State of Delaware |
| STILLFRONT MIDCO AB, | § § | C.A. No. 2021-0870 |
| Defendant Below, Appellee. | § § § | |

Submitted: October 22, 2025
Decided: February 13, 2026

Before **SEITZ**, Chief Justice; **VALIHURA** and **TRAYNOR**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED.**

Philip Trainer, Jr., Esquire, Samuel M. Gross, Esquire, ASHBY & GEDDES, Wilmington, Delaware; Lloyd Winawer, Esquire, Daniel J. Bergeson, Esquire, John D. Pernick, Esquire, Susan Bower, Esquire, BERGESON LLP, San Jose, California, *for Plaintiff Below, Appellant Fortis Advisors, LLC.*

John L. Reed, Esquire, Kelly L. Freund, Esquire, DLA PIPER LLP, Wilmington, Delaware; Mallory Biblo, Esquire, DLA PIPER LLP, Dallas, Texas, *for Defendant Below, Appellee Stillfront Midco AB.*

**TRAYNOR**, Justice:

We are called upon to review the Court of Chancery's interpretation of an alternative-dispute-resolution ("ADR") provision in a merger agreement under which the parties agreed to resolve disputes over the calculation of a post-closing earnout payment. The buyer invoked the provision and moved to compel arbitration after the seller representative sued it for breach of contract and breach of the implied covenant of good faith and fair dealing. Among other things, the seller representative alleged that the buyer had materially breached the merger agreement by acting in bad faith to reduce the earnout amount and by failing to provide information and access to personnel.

In response to the buyer's motion to compel arbitration, the seller representative argued that the ADR provision, which refers a dispute over an earnout calculation to an accounting-firm arbitrator, was a narrow carve-out to the parties' agreement to have a Delaware court adjudicate "any action or proceeding arising out of or related to" the merger agreement.

The Court of Chancery disagreed with the seller representative. To the court's way of thinking, the seller representative's bad-faith claim was at its core a dispute concerning the buyer's calculation of the earnout and thus fell within the ambit of the ADR provision. And the alleged violation of the seller representative's information rights, according to the court, was an issue of procedural arbitrability,

2

which, under settled law is for the arbitrator—not the court—to decide. Consequently, the court compelled arbitration. In due course, the arbitrator issued a determination that the seller representative was not entitled to any recovery. The Court of Chancery confirmed this determination and entered judgment in favor of the buyer.

In this appeal, the seller representative challenges the Court of Chancery's decision to compel arbitration of its claims. Among other arguments, the seller representative now contends that the ADR provision at issue called for an expert determination and not an arbitration. Such a classification would, the seller representative contends, support its position that the arbitrator's remit was exceedingly narrow and did not include consideration of its claims. It also challenges the court's confirmation of the arbitrator's determination in keeping with its allegation during the confirmation proceedings that the arbitrator was acting, unbeknownst to the seller representative, under an undisclosed conflict of interest.

In this opinion we conclude that the seller representative's bad-faith breach claims fall within the compass of the ADR provision. In reaching this conclusion, we hold the seller representative to its framing of the issues in the Court of Chancery and, in particular, its acknowledgement that the parties had agreed to submit the earnout determination to arbitration. And because we view the bad-faith breach claims as contesting the accuracy of the buyer's earnout determination—the subject

3

matter of the issue the parties agreed to arbitrate—we conclude that the Court of Chancery did not err by compelling arbitration. We also hold that the seller representative's information-rights claim was for the arbitrator to decide. And finally, we discern no error in the court's refusal to vacate the arbitrator's award because of undisclosed relationships between his firm and the buyer's counsel. We therefore affirm the Court of Chancery's judgment.

I

A

Kixeye is an online video game company that creates, develops, and publishes strategy games for personal computers and mobile devices.[1] In accordance with an Agreement and Plan of Merger dated June 3, 2019 (the "merger agreement"), Stillfront acquired Kixeye on June 24, 2019.[2] Fortis is the Seller Representative under the merger agreement.[3]

B

Under the merger agreement, Stillfront agreed to pay a base purchase price of $90,000,000.[4] The merger agreement also provides for an earnout bonus if Kixeye's "Adjusted EBITDA" for the year ending December 31, 2019 exceeded

---

[1] App. to Opening Br. at A24–25, A202.
[2] *Id.* at A24–25, A37–38, A86.
[3] *Id.* at A114–17.
[4] *Id.* at A103, A202.

$15,000,000.[5]  The maximum possible earnout amount was $30,000,000.[6]  The parties consented to "the exclusive jurisdiction of any court of the State of Delaware, sitting in New Castle County, or the United States District Court for the District of Delaware . . . in any action or proceeding arising out of or relating to" the merger agreement.[7]  But they also included an ADR provision that provided an expedited mechanism for the resolution of a dispute over the calculation of the earnout amount.  Because the scope of the provision—§ 2.14 of the merger agreement—is the dispositive issue on appeal, we set it forth in some detail here.

Section 2.14 of the merger agreement (the "Earnout Calculation Provision") establishes a three-step procedure to calculate the earnout.[8]

i

First, § 2.14(a), titled "Earnout Determination," provides for the surviving corporation's independent auditors to deliver a report with the surviving corporation's financial statement for the year ending on December 31, 2019:

> Promptly, but in any event no later than 45 days after the date that the Surviving Corporation's independent auditors (which auditors shall be the same as used by the Company prior to the Closing) deliver a report with respect to the Surviving Corporation's financial statements for the year ending December 31, 2019, [Stillfront] shall prepare and deliver to [Fortis] a statement (the "Earnout Determination Statement") setting forth [Stillfront]'s calculation of the Earnout Amount.  [Stillfront] shall

---

[5] *Id.* at A91, A103, A118.
[6] *Id.* at A91.
[7] *Id.* at A163.
[8] *Id.* at A117–18.

make available to [Fortis] such financial statements prepared by the independent auditor as well as the work papers, schedules, memoranda, and other documents that [Stillfront] prepared or reviewed in determining the amounts set forth on the Earnout Determination Statement and concurrently shall provide [Fortis] access to the Company's books and records to the extent reasonably necessary for [Fortis] to complete its review of [Stillfront]'s calculations contained in the Earnout Determination Statement.[9]

Next, § 2.14(b), titled "Disagreement," outlines the procedures available to Fortis if it wishes to dispute the Earnout Determination Statement provided by Stillfront:

The Earnout Determination Statement shall become final and binding upon the parties on the 30th day following receipt thereof by [Fortis] unless [Fortis] gives written notice of its disagreement (the "Earnout Disagreement Notice") to [Stillfront] prior to such date. Any Earnout Disagreement Notice shall (x) specify in reasonable detail, and on a line item by line item basis (if applicable), the disputed items and the nature and/or amount of any disagreement so asserted (the "Disputed Earnout Items"), (y) an alternative amount (if applicable) for each such Disputed Earnout Item and (z) shall include a proposed calculation by [Fortis] of the Earnout Amount. Any item in the Earnout Determination Statement that is not an Disputed Earnout Item specifically referred to the Arbitrator pursuant to Section 2.14(c) shall be deemed final and binding on the parties (as set forth in the Earnout Determination Statement or as otherwise agreed to in writing by [Stillfront] and [Fortis]). If there is no disagreement with respect to the Earnout Amount as set forth in the Earnout Determination Statement, then [Stillfront]'s calculation of the Earnout Amount shall be the Conclusive Earnout Amount.[10]

Finally, § 2.14(c), titled "Referral to Arbitrator," sets forth the process of resolving disputes over the earnout calculation:

---

[9] *Id.* at A117.
[10] *Id.*

6

If [Fortis] and [Stillfront] are unable to reach agreement within 30 days after the date [Stillfront] received the Earnout Disagreement Notice, either party shall have the right to refer such matter to the Arbitrator starting on such 45th day. The Arbitrator shall determine the actual Earnout Amount (the "Conclusive Earnout Amount") within 30 calendar days of such referral, and such determination shall be final and binding on [Stillfront], [Fortis] and the Sellers for all purposes of this Agreement. All fees and expenses of the Arbitrator in connection with this Section 2.14(c) shall be paid by [Fortis], on behalf of the Sellers, (if the Conclusive Earnout Amount is less than or equal to the Earnout Amount determined in accordance with the Earnout Determination Statement) or [Stillfront] (if the Conclusive Earnout Amount is greater than the Earnout Amount determined in accordance with the Earnout Determination Statement).[11]

The merger agreement defines "Arbitrator" as "a nationally or regionally recognized accounting firm mutually agreed in good faith by [Stillfront] and [Fortis] that does not have a material relationship with [Stillfront], [Fortis,] or [Kixeye].[12]

ii

Section 2.14(e) sets forth certain operational covenants relevant to the earnout determination. Specifically, Stillfront covenanted that "the Surviving Corporation shall not take any action in bad faith to reduce any Earnout Amount" and that "the Surviving Corporation shall not terminate any Key Employee [without cause]."[13] The parties agreed in § 2.14(g) that, if Stillfront breached either of these operational covenants, "the Conclusive Earnout Amount shall be assumed to be the maximum

---

[11] *Id.* at A117–18.
[12] *Id.* at A87.
[13] *Id.* at A118.

7

Earnout Amount and such amount shall become due and payable June 30, 2020."[14]

§ 2.14(g) provides, however, that "if [Stillfront] can prove in the Earnout Determination process described in Section 2.14(a)–(c) a lesser Conclusive Earnout Amount would have been earned, but for the breach of Section 2.14(e), then [Stillfront] shall only have to pay such amount."[15]

iii

Section 2.12(g) of the merger agreement (the "Information Provision") states that Fortis, as the Seller Representative, shall have "reasonable access to information about the Surviving Corporation and the reasonable assistance of [] officers and employees . . . for the purpose of performing their duties and exercising their [contractual] rights."[16]

C

On October 8, 2021, Fortis filed suit against Stillfront in the Court of Chancery,[17] alleging two breach of contract claims and, in the alternative, a claim for breach of the implied covenant of good faith and fair dealing.  In one count, Fortis alleged that Stillfront violated the operational covenants by slashing Kixeye's marketing expenditures in bad faith.[18]  In another, Fortis alleged that Stillfront's

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at A116.
[17] *Id.* at A22.
[18] *Id.* at A63–69, A74–75.

Earnout Determination Statement, which reported Kixeye's Adjusted EBITDA at approximately $6,700,000, breached the merger agreement's requirement that Adjusted EBITDA be determined "in accordance with Schedule 1.1(a)."[19]  In particular, Fortis alleged that Stillfront "unilaterally and retroactively readjust[ed] Kixeye's operating expenses for the Pre-Merger 2019 Period to amounts materially in excess of the average monthly amounts presented on Schedule 1.1(a) of the Merger Agreement (enabling it to materially decrease Kixeye's 2019 Adjusted EBITDA)."[20]  Fortis pleaded, in the alternative, that should the court determine that Stillfront's adjustment was not prohibited under the express terms of the merger agreement, then a term precluding Stillfront from doing so should be implied.[21]  This formed the basis of Fortis's implied-covenant claim.  And finally, Fortis alleged that Stillfront breached the Information Provision, severely inhibiting Fortis' ability to prepare an Earnout Disagreement Notice.[22]

Two months later, Stillfront moved to compel arbitration and dismiss Fortis's complaint under Court of Chancery Rule 12(b)(1).[23]  In response to Stillfront's motion, Fortis argued that, under the merger agreement, the Court of Chancery—and not an accounting firm—had exclusive jurisdiction over its claims that Stillfront

---

[19] *Id.* at A35, A68–69, A73.
[20] *Id.* at A76.
[21] *Id.*
[22] *Id.* at A69–73, A75.
[23] *Id.* at A20, A189–225.

9

had breached the agreement's operational covenants and Information Provision, as well as the implied covenant of good faith and fair dealing. Fortis contended that "[t]he parties never agreed that claims for bad faith or breach of the Merger Agreement's information access provisions—neither of which require any calculation—would be adjudicated by an accountant[.]"[24] The Court of Chancery saw it differently. These claims, in the court's view, were subsumed within the parties' agreement to refer disputes over the calculation of the Earnout Amount to an "Arbitrator." For the court, "the subject matter of the dispute is the calculation of the earnout"[25] and, because the alleged breaches concerned the calculation of the earnout, the breach claims were for the "Arbitrator" to decide. The court thus granted Stillfront's motion to compel and dismissed Fortis's complaint with prejudice.

## D

In the wake of the Court of Chancery's order, counsel for the parties spoke with two accounting firms that satisfied the merger agreement's definition of "Arbitrator" before jointly agreeing to engage BDO USA, LLP.[26] In November 2022, the parties jointly engaged BDO to act as the arbitrator for resolution of the dispute and agreed to submit their dispute to Jeffrey Katz of BDO's New York

---

[24] *Id*. at A239.
[25] Opening Br. Ex. A at 10.
[26] App. to Opening Br. at A536–37, A574–75, A1212.

office.[27]  The agreement was memorialized in BDO's engagement letter that

contained, among other things, the following provisions:

> **Proposed Services to the Parties**
> The Parties have agreed that Jeffrey Katz of BDO, shall serve as
> the professional responsible for the Arbitration . . . .  Mr. Katz will make
> a determination in an impartial manner based on such inquiry,
> investigation and other procedures as he may deem necessary, but Mr.
> Katz shall not be required to follow the practices and procedures that
> would be required for an audit in accordance with generally accepted
> auditing standards . . . .  Mr. Katz shall adjudicate the Claims, including
> without limitation, the determination of the Conclusive Earnout
> Amount under Section 2.14 of the [Merger] Agreement and such
> adjudication "shall be final and binding on [Stillfront], [Fortis] and the
> Sellers for all purposes of [the Merger] Agreement.
>
> **Conflicts of Interest**
> BDO is not aware of any conflicts of interest with respect to any
> of the names provided by the Parties.  BDO is not responsible for
> continuously monitoring other potential conflicts that could arise
> during the course of the engagement, although we will inform the
> Parties to this Engagement Letter promptly should any come to our
> attention . . . .  Additionally, our engagement by the Parties will in no
> way preclude us from being engaged by any other party in the future
> [.][28]

Approximately one year later and after a lengthy discovery process, Katz held

a full-day hearing in which the parties presented their positions.[29]  No witnesses

testified at the "hearing."  On March 12, 2024, Katz issued the Arbitration Award

(the "Award"), concluding that no change was required to Stillfront's calculation of

---

[27] *Id.* at A1212, A1250.
[28] *Id.* at 642–48.
[29] *Id.* at A412, A719, A1214, A1317.

the Adjusted EBITDA or the earnout amount and determining that Fortis was not entitled to any recovery.[30] BDO did not perform its own Adjusted EBITDA or earnout calculation. Katz also found that "there [was] insufficient evidence of bad faith by [Stillfront]."[31]

E

Following the Award, the parties filed competing motions, Stillfront to confirm and Fortis to vacate the Award. Fortis argued that the Award should be vacated on grounds of "evident partiality" because BDO failed to disclose alleged conflicts with Stillfront's counsel—DLA Piper ("DLA").[32] Fortis advanced three grounds for its argument: (1) DLA's contemplated engagement with BDO in a separate case, (2) uncertainty regarding DLA's representation of other BDO entities based on a public affidavit in an unrelated bankruptcy proceeding, and (3) BDO's designation as the accounting firm to adjudicate post-closing working capital and purchase-price-adjustment disputes in three agreements.[33] In support of its motion, Fortis submitted the Expert Affidavit of Douglas R. Carmichael, who several decades earlier held "the highest technical position" at the American Institute of Certified Public Accountants ("AICPA"), which "sets ethical standards and U.S.

---

[30] *Id.* at A408–22.
[31] *Id.* at A421.
[32] *Id.*
[33] *Id.*

auditing standards."[34]  In his affidavit, Dr. Carmichael concluded that BDO had failed to make required disclosures and violated applicable AICPA standards.[35]

On March 28, 2025, the Court of Chancery granted Stillfront's motion to confirm the Award and denied Fortis's motion for summary judgment.[36]  Fortis appealed.

F

Fortis now argues that the Court of Chancery erred by construing the Earnout Calculation Provision as providing for arbitration, rather than a narrow expert determination.[37]  Alternatively, Fortis contends that, even if the Earnout Calculation Provision is an arbitration clause, the disputed claims do not fall within its narrow scope. [38]  Additionally, Fortis claims that the Court of Chancery improperly confirmed the Award and that Fortis's allegations of evident partiality required the court to either vacate the Award or approve post-arbitration discovery.[39]

Stillfront maintains that the Court of Chancery correctly interpreted the Earnout Calculation Provision as an arbitration clause.[40]  Stillfront contends that the

---

[34] *Id.* at A580–81.  To be sure, Mr. Carmichael's credentials in the field of accounting extend well beyond the position he held at the AICPA.  We limit our reference to his association with the AICPA because his opinion was tied closely to professional standards set by the AICPA.
[35] *Id.* at A599–604.
[36] Opening Br. Ex. C.
[37] Opening Br. at 6, 26.
[38] *Id.* at 25, 31.
[39] *Id.* at 43–47.
[40] Answering Br. at 31.

disputed claims were issues of procedural arbitrability that were within the arbitrator's purview.[41]  Finally, Stillfront contends that Fortis failed to meet the high burden required to demonstrate that the Award was the product of evident partiality.[42]

## II

## A

Because the Court of Chancery's order compelling arbitration and dismissing Fortis's complaint hinged upon its interpretation of § 2.14 of the merger agreement, our review of that order is *de novo*.[43]  The Court of Chancery denied vacatur of the arbitration award under the narrow evident partiality standard.[44]  On appeal, however, we review that determination *de novo*.[45]

---

[41] *Id.* at 6, 24–30.

[42] *Id.* at 39–40.

[43] *Terrell v. Kiromic Biopharma, Inc.*, 297 A.3d 610, 616–17 (Del. 2023).

[44] Opening Br. Ex. C; *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014) ("[R]eview of an arbitration award is one of the narrowest standards of judicial review in all of American jurisprudence." (quoting *TD Ameritrade, Inc. v. McLaughlin, Piven, Vogel Sec., Inc.*, 953 A.2d 726, 732 (Del. Ch. 2008))).

[45] *See Del. Transit Corp. v. Amalgamated Transit Union Loc. 842*, 34 A.3d 1064, 1070–73 (Del. 2011) (making an independent determination that alleged bias did not meet the evident partiality standard); *see also Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012) ("On appeal from a . . . ruling on a motion to confirm or vacate an arbitration award, we review its legal conclusions de novo." (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 947–48 (1995))); *CCSB Fin. Corp. v. Totta*, 302 A.3d 387, 402 (Del. 2023) ("Our review is *de novo* for the court's legal determinations.").

B

In its lead argument on appeal, Fortis contends that the Court of Chancery erred by treating § 2.14's ADR mechanism as an arbitration clause. According to Fortis, the court should have instead viewed § 2.14 as calling for a "narrow accounting-based expert determination"[46] and thus not subject to the principles that govern arbitration. In pressing this argument, Fortis relies heavily on three decisions—one from our Court, another from the Court of Chancery, and a third from the Third Circuit Court of Appeals—each of which addresses how courts should classify contractual ADR provisions similar to § 2.14 and how that classification affects the decision-making process.

It is noteworthy that these decisions—*Terrell v. Kiromic Biopharma, Inc.*,[47] *ArchKey Intermediate Hldgs. Inc. v. Mona*,[48] and *Sapp v. Indus. Action Servs., LLC*[49]— were all announced in the year following the court's granting of Stillfront's

---

[46] Opening Br. at 26.

[47] 297 A.3d 610 (Del. 2023). In *Terrell*, we examined the difference between arbitration and expert determinations and upheld the Court of Chancery's ruling that a contractual provision referring disputes regarding the interpretation of a stock-option agreement was not an arbitration provision but called for an expert determination. *Id.*

[48] 302 A.3d 975 (Del. Ch. 2023). In *Mona*, the Court of Chancery considered "a post-closing price adjustment mechanism in an acquisition agreement that refers a dispute to an independent accountant." *Id*. at 981. After a comprehensive discussion of where the mechanism was situated on "the ADR spectrum," *id*. at 989, the court determined that the mechanism, which resembles § 2.14 in many respects, was not an arbitration.

[49] 75 F.4th 205 (3d Cir. 2023). In *Sapp*, the Third Circuit Court of Appeals addressed an earnout provision that is remarkably similar to § 2.14 and concluded that the parties had agreed to an expert determination of narrow accounting-related questions and mediation and litigation of all other disputes. *Id.*

15

motion to compel arbitration. Without the benefit of the analyses found in these opinions, Fortis framed—and the court resolved—the questions regarding the scope of § 2.14 under the assumption that it was an arbitration provision and not one calling for an expert determination. Indeed, Fortis was emphatic that the parties agreed to submit the earnout dispute to arbitration. At oral argument on Stillfront's motion to compel arbitration in the Court of Chancery, Fortis's counsel repeatedly referred to § 2.14 as an arbitration provision and even asked himself rhetorically whether "the parties agree[d] to arbitrate something?"[50] His answer: "No dispute here on that issue."[51] Given this framing and despite the apparent relevance of the lines drawn between arbitration and expert determination in *Terrell*, *ArchKey Insurance*, and *Sapp*, we hold Fortis to its identification of § 2.14 as an arbitration provision.[52]

C

That we are impelled by Fortis's framing below to treat § 2.14 as an arbitration provision does not end our inquiry. Fortis's secondary argument on appeal is that,

---

[50] App. to Opening Br. at A347.
[51] *Id.*
[52] We note here that the distinction between arbitration and expert determinations was discussed in Court of Chancery decisions predating Fortis's opposition to Stillfront's motion to compel arbitration in this case. In fact, the Court of Chancery opinion that we reviewed in *Terrell* was issued before Fortis's opposition was filed and discussed Vice Chancellor Laster's 2018 decision in *Penton Bus. Media Hldgs., LLC v. Informa PLC*, 252 A.3d 445 (Del. Ch. 2018). *Terrell v. Kiromic Biopharma, Inc.,* 2022 WL 175858, at *4 (Del. Ch. Jan. 20, 2022). *Penton Bus. Media Hldgs.* poses—and answers—the question: Does Delaware Recognize A Distinction Between An Arbitration and An Expert Determination? *Penton Bus. Media Hldgs.,* 252 A.3d at 454.

16

even if § 2.14 is construed as an arbitration provision, it did not authorize the arbitrator to adjudicate the claims alleged in Fortis's complaint.

Under one articulation of the framework for determining arbitrability, our inquiry should focus on two issues: "First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration."[53] When the court evaluates a narrow arbitration clause, "it will ask if the cause of action pursued in court directly relates to the right in the contract."[54] If, on the other hand, "the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance."[55]

Another formulation, this one in the context of the arbitration of an earnout calculation, and so the one featured prominently in the Court of Chancery's analysis in this case, downplays the significance of labeling ADR provisions as broad or narrow. In *Viacom Int'l Inc. v. Winshall*,[56] this Court observed that "[w]hether an arbitration provision is branded 'narrow' or 'broad,' the only question that the court should decide is whether the subject matter in dispute falls within it."[57]

---

[53] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002).
[54] *Id.*
[55] *Id.*
[56] 72 A.3d 78 (Del. 2013).
[57] *Id.* at 83–84.

17

Like this case, the dispute in *Viacom* centered on earnout payments under a merger agreement. When a stockholder representative disputed an earnout statement calculated by Viacom, the parties submitted their "Earn-Out Disagreements" to BDO, USA LLP, who was referred to as the "Resolution Accountants." The engagement letter with the Resolution Accountants "specified the manner in which Viacom was to produce additional documents; the dates on which initial and reply submissions were due; the manner in which BDO could submit and receive answers to substantive questions prior to the hearing; and the manner in which the hearing would be conducted."[58]

During the prehearing submission phase, a dispute arose as to the propriety of Viacom's deductions for the cost of the target's unsold inventory—an issue that had not been flagged in the "Earnout Disagreements" submitted to BDO. The parties could not agree whether BDO should consider the unsold-inventory dispute in reaching its determination. And when BDO issued its decision, it agreed with the stockholder representative that the inventory write-down should not be considered because it was not included in Viacom's earnout statement.

Unhappy with BDO's decision and earnout determination, Viacom sought a declaration in the Court of Chancery vacating BDO's determination on the ground that it constituted manifest error. Relevant to our analysis here, the parties agreed

---

[58] *Id.* at 79.

that Viacom's challenge was governed by the Federal Arbitration Act. Viacom grounded its challenge in § 10(a)(3) of the Act,[59] arguing that BDO's decision "should be vacated . . . because BDO's refusal to hear pertinent material evidence rendered the arbitration fundamentally unfair."[60] According to Viacom, BDO's refusal to consider the inventory write-down "was not a decision as to the scope of the arbitration[,] [but] was simply an unfair exclusion of very significant evidence that would have had a $200 million impact on the calculation."[61]

This Court ruled that Viacom's claim that the arbitrator was guilty of misconduct by ignoring relevant evidence lacked merit. More specifically, the Court concluded that

> BDO did not ignore any relevant evidence. Rather, it decided that evidence concerning an inventory write-down could not be considered, absent consent of the parties, because that issue was not identified in the original documents governing the scope of the arbitration. There was no misconduct, even if BDO's decision on that issue was incorrect.[62]

The Court rejected Viacom's contention that BDO's decision to exclude the inventory write-down was one of substantive arbitrability, which would be a

---

[59] Section 10(a)(3) of the Federal Arbitration Act provides in relevant part that "the . . . court . . . may make an order vacating the award upon the application of any party to the arbitration . . . where the arbitrators were guilty of misconduct in refusing to hear evidence pertinent and material to the controversy. . . ."

[60] *Viacom*, 72 A.3d at 80.

[61] *Id*. at 81.

[62] *Id*.

"gateway question"[63] to be decided by the court.  Instead, the Court identified BDO's decision as "an issue of procedural arbitrability, properly decided by the arbitrator."[64]  In reaching this conclusion, we quoted approvingly the Court of Chancery's succinct explanation of the difference between substantive arbitrability and procedural arbitrability:

> In determining whether a claim is subject to arbitration, the court must distinguish between issues of "substantive arbitrability" and "procedural arbitrability."  Issues of substantive arbitrability are gateway questions relating to the scope of an arbitration provision and its applicability to a given dispute, and are presumptively decided by the court.  Procedural arbitrability issues concern whether the parties have complied with the terms of an arbitration provision, and are presumptively handled by arbitrators.  These issues include whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability.[65]

Applying this framework, we concluded that "[i]f the subject matter to be arbitrated is the calculation of an earn-out, . . . . all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator."[66]  In determining what information to consider, "the arbitrator may . . . rely on the terms of the underlying agreement, and the arbitrator's interpretation of the agreement is likely to affect the scope of the arbitration."[67]  We

---

[63] *Id*. at 82 (quoting *Viacom Int'l, Inc. v. Winshall*, 2012 WL 3249620, at *12 (Del. Ch. Aug. 9, 2012)).
[64] *Id*. at 83.
[65] *Id*. at 82 (quoting *Viacom Int'l, Inc.*, 2012 WL 3249620, at *12).
[66] *Id.* at 83.
[67] *Id.*

agree with the Court of Chancery—especially in light of Fortis's acknowledgement in that court that the calculation of the Earnout Amount was to be arbitrated—that *Viacom* is a suitable analog to the issues presented in this case. We thus apply *Viacom* to assess the arbitrability of Fortis's claims.

As mentioned above, Fortis's breach of contract claims are grounded in three provisions in the merger agreement. First, Fortis alleged that Stillfront failed to calculate Kixeye's 2019 Adjusted EBITDA in accordance with Schedule 1.1(a), materially increasing Kixeye's expenses so that no earnout payment would be owed. Second, Fortis alleged that Stillfront acted in bad faith by manipulating Kixeye's gross bookings and reducing its marketing expenditures. These ploys, according to Fortis, had the effect of reducing the 2019 Adjusted EBITDA and were motivated by Stillfront's desire to eliminate any possibility of owing an earnout payment. By Fortis's lights, the conduct underlying both of these breach claims violated § 2.14(e)'s operational covenant to refrain from "tak[ing] any action in bad faith to reduce any Earnout Amount . . . ."[68] And dire consequences would attend operational covenant breaches by Stillfront—a presumptive obligation to pay the maximum Earnout Amount. Third, Fortis alleged that Stillfront breached the merger agreement—and, specifically, §§ 2.12(g) and 2.14(a)—by failing to provide Fortis with information and access to personnel in response to Fortis's legitimate requests.

---

[68] App. to Opening Br. at A118.

We see the first and second of these claims—the bad-faith breach claims, which we address first—as standing on different footing than the third.

i

The subject matter of the issue referred to the Arbitrator under § 2.14 is the calculation of the Earnout Amount. Given the clarity of § 2.14's language—"[t]he Arbitrator shall determine the actual Earnout Amount . . . , and such determination shall be final and binding . . ."—Fortis conceded as much in the Court of Chancery. And under *Viacom*, as we noted before, "if the subject matter to be arbitrated is the calculation of an earn-out, . . . all issues as to what financial or other information should be considered in performing the calculation are decided by the arbitrator."[69]

Stillfront's post-merger conduct underlying Fortis's bad-faith breach claims had a direct bearing on how the Earnout Amount should be determined. Indeed, by way of its bad-faith breach claims, Fortis in essence proffers its explanation as to why Stillfront's Earnout Determination Statement was flawed. We agree with the Court of Chancery that treating the bad-faith breach claims as outside the Arbitrator's purview inappropriately "slice[s] the question of 'why' the calculation of the earnout is wrong out of the arbitration clause."[70]

---

[69] *Viacom*, 72 A.3d at 83.
[70] App. to Opening Br. at A385.

22

Against this straightforward analysis, Fortis argues that the language of the Earnout Calculation Provision decouples the bad-faith breach claim from the calculation of the actual Earnout Amount.[71] It does so, under Fortis's reading, because "'*actual* Earnout Amount' is a term tied to Kixeye's actual Adjusted EBITDA, not to any breach of the Operational Covenants" under § 2.14(e), which would trigger the rebuttable earnout presumption.[72] For Fortis, the arbitrator was empowered to calculate the *actual* earnout amount but was precluded from determining that, because of Stillfront's bad-faith breaches, Fortis was entitled to the *presumptive* earnout amount, that is, the $30 million maximum earnout payment.

We are not swayed by the fine distinction Fortis draws between a calculation of the earnout amount linked to Kixeye's Adjusted EBITDA and a determination that, because Stillfront manipulated the EBITDA figure in bad faith, it must pay the presumptive earnout amount under § 2.14(g). In both cases, the Arbitrator is determining the earnout amount to which Fortis is *actually* entitled. The Court of Chancery correctly stepped aside so that the arbitrator could perform that task.

---

[71] Reply Br. at 11.

[72] *Id.*(emphasis in original).

We conclude likewise that the Court of Chancery properly dismissed and referred to arbitration Fortis's breach claim under the merger agreement's information-access provisions. In its bench ruling, the court saw this claim as presenting "an issue as to what information must be considered in making the arbitrator's decision"[73] and, as such, an issue of procedural arbitrability within the arbitrator's purview.

The information provisions themselves—§§ 2.12(g) and 2.14(a)—provide a link between Fortis's contractual right to information and access to personnel, on the one hand, and the earnout determination, on the other. As previously mentioned, under § 2.12(g), Fortis secured the right to provide the Seller Representative with "reasonable access to information about the Surviving Corporation and the reasonable assistance of the officers and employees of Parent and the Surviving Corporation for purposes of performing their duties and exercising their rights under the [Merger] Agreement and the Escrow Agreement."[74] One of those rights was to object to Stillfront's Earnout Determination Statement and trigger arbitration. Indeed, Fortis's complaint recognizes the relationship between § 2.12(g)'s information-access provisions and the Earnout Determination under § 2.14,

---

[73] Opening Br. Ex. A at 11–12.
[74] App. to Opening Br. at A116.

chastising Stillfront for preliminarily taking the position that there was no such relationship.[75] Fortis also grounds its information-access claim in three § 2.14 earnout provisions themselves.[76]

Fortis now argues that its ability to enforce its information and personnel-access rights "was critical because that access was necessary *before* submitting its Earnout Determination Notice, not afterward—when it would be too late."[77] It would be too late, according to Fortis, because any disputed earnout item not identified in its Earnout Determination Notice would be deemed final and binding under § 2.14(b) and that, therefore, the arbitrator would be unable to consider "subsequently discovered issues, even if based on documents belatedly produced."[78] This argument, in our view, substantiates the Court of Chancery's perception that the claim implicates what information the arbitrator must consider. And under *Viacom*, "all issues as to what financial or other information should be considered in performing the [earnout] calculation are decided by the arbitrator."[79]

---

[75] In Paragraph 83 of its Verified Complaint, Fortis alleged that "Stillfront incorrectly took the position that Section 2.12(g) of the Merger Agreement does not apply in the context of an inquiry or dispute related to the Earnout Amount and refused to provide Fortis with access to information or personnel pursuant to that Provision." *Id*. at A71–72.

[76] App. to Opening Br. at A117.

[77] Opening Br. at 40(emphasis in original).

[78] *Id*. This is not to say that Fortis's information rights related exclusively to § 2.14's earnout provisions. But Fortis has not contended that the information and personnel access it was denied was relevant to any dispute other than the earnout dispute.

[79] *Viacom*, 72 A.2d at 83.

In the event, Fortis invoked its information rights in the arbitration, and the arbitrator granted Fortis's expansive request for production.[80] According to an affidavit filed in the summary-judgment proceedings in the Court of Chancery, Stillfront produced over 10,000 pages of documents in response to the arbitrator's order. And to the best of this Court's knowledge, Fortis has not claimed that its rights in arbitration were prejudiced by an inadequate production.

Taking all this into account, we conclude that the Court of Chancery did not err in its decision to compel arbitration of Fortis's information-rights claim.

D

Finally, we turn to Fortis's claim that the Court of Chancery erred by concluding that BDO's failure to disclose its relationship's with DLA did not warrant vacatur of BDO's determination.

We have recognized that "an arbitrator's failure to disclose a substantial relationship with a party or a party's attorney justifies vacatur under an 'evident partiality' standard."[81] "[T]o demonstrate evident partiality sufficient to require vacatur, however, the record must reflect that an arbitrator failed to disclose a *substantial* personal or financial relationship with a party, a party's agent, or a party's attorney that a reasonable person would conclude was powerfully suggestive

---

[80] App. to Opening Br. at A97–99.
[81] *Del. Transit Corp.*, 34 A.3d at 1070.

of bias."[82]  "The party seeking the disqualification of an arbitrator bears the burden of establishing the basis for recusal."[83]  "[T]he moving party must identify an undisclosed relationship between the arbitrator and a party or the party's agent that is 'so intimate—personally, socially, professionally[,] or financially—as to cast serious doubt on [the arbitrator's] impartiality."[84]  Additionally, the alleged personal conflict "must be direct, definite, and capable of demonstration rather than remote, uncertain[,] or speculative."[85]

Fortis's claim of evident partiality is based on BDO's undisclosed interactions with DLA.  On appeal, Fortis points to (i) the efforts of Stillfront's former lead counsel shortly after BDO was engaged in this matter regarding a separate engagement with BDO that never reached fruition and (ii) DLA's disclosure in a federal bankruptcy proceeding it represented other BDO entities in unrelated proceedings.

Citing *Beebe Medical Center, Inc. v. Insight Health Services, Corp.*, Fortis argues that BDO's failure to disclose these relationships with DLA Piper requires vacatur or, at a minimum, discovery.[86]  A combination of factors undermines Fortis's argument.  In the first place, *Beebe* is distinguishable.  There, the Court of

---

[82] *Id.* at 1072 (emphasis added).
[83] *Id.* at 1073.
[84] *Id.* (quoting *Health Servs. Mgmt. Corp. v. Hughes*, 975 F.2d 1253, 1264 (7th Cir. 1992)).
[85] *Id.*
[86] Opening Br. at 45; Reply Br. at 25.

Chancery found grounds for vacatur because the arbitrator was simultaneously represented in a pending matter before the Superior Court by the same attorney representing the defendant in the arbitration.[87] In fact, the arbitrator was so financially invested in and attentive to the other litigation that he sought removal of defendant's counsel in that case.[88] No such relationship was present here.

For context, the Court of Chancery noted that "both BDO, DLA Piper, and Fortis are regular participants in these types of cases and that BDO and DLA Piper are large-scale entities with a well-known global reach."[89] The court described the parties as "repeat players that live and breathe within this transactional ecosystem."[90] But more to the point, Fortis produced insufficient evidence to allege a relationship that is direct, definite, and intimate enough as to cast serious doubt on Arbitrator Katz's impartiality.

First, Fortis's reliance upon emails between DLA and BDO, in which DLA seeks to engage BDO in a wholly unrelated matter, is misplaced.[91] Specifically, these twelve emails, sent shortly after BDO's engagement in this matter, constitute an arm's-length transaction between two market professionals.[92] It is true that Katz

---

[87] *Beebe Med. Ctr., Inc. v. InSight Health Servs. Corp.*, 751 A.2d 426, 427, 429, 438 (Del. Ch. 1999).
[88] *Id.* at 432.
[89] Opening Br. Ex. C at 21.
[90] *Id.*
[91] *See* Opening Br. at 44–45.
[92] App. to Opening Br. at A734–42.

was copied on these emails.[93]  But, they are not, to our minds, powerfully suggestive of bias.  In fact, they appear to undermine Fortis's argument, highlighting BDO's awareness of bias concerns and attempts to maintain neutrality.[94]  Even so, this proposed engagement never materialized.  Further still, Fortis and Stillfront are sophisticated actors;  we presume they intelligently and knowingly engaged BDO, whose engagement letter specifically reserved its right to engage either party in future matters.[95]

Fortis next points to DLA's disclosure in a federal bankruptcy proceeding that "BDO LLP," of which BDO USA is an affiliate, was a "[c]urrent client and affiliate of current and former clients on matters unrelated to [the bankruptcy]."[96]  This relationship, in our view, is too attenuated to equate it with the obvious and substantial impartiality seen in *Beebe*.  At most, this disclosure suggests that, during the relevant period, DLA represented an affiliate of BDO, not BDO itself. More

---

[93] *See id.*

[94] *See id.* at A737 ("I or Jeff (likely me as I do not have any previous relationship with the parties or counsel) would work closely with Michelle as quality partner, consistent with our practice for concurring review on projects."); *see also id.* at A740.  Fortis draws attention to the fact that, according to another BDO professional, Mr. Katz appears to have had a "previous relationship with the parties or counsel"—referring to DLA. Opening Br. at 44–45 (quoting App. to Opening Br. at A736–37).  We see little significance in this allegation, however. These emails are dated after BDO engaged with Fortis and Stillfront in this matter.  Without more, we see this comment as nothing more than reference to the present dispute.

[95] App. to Opening Br. at A429 ("[O]ur engagement by the Parties will in no way preclude us from being engaged by any other party in the future."); *see also id.* ("BDO is not responsible for continuously monitoring other potential conflicts that could arise during the course of the engagement.").

[96] Opening Br. at 44 (quoting App. to Opening Br. at A679).

29

importantly, Fortis fails to show how, or even if, this alleged representation extended to Katz, or if Katz was even aware of it.

Fortis additionally argues that the Court of Chancery improperly failed to give weight to an unrebutted affidavit from their expert, discussing the "ethical standards and U.S. auditing standards" set by the AICPA.[97] Specifically, Fortis contends that the Court of Chancery improperly rejected its contention that "a violation of professional accounting standards was equivalent to a violation of an arbitral body's disclosure rules."[98] As to this point, it is worth noting that BDO's engagement letter specifically provides that "Katz shall not be required to follow the practices and procedures that would be required for an audit in accordance with generally accepted auditing standards and no audit report, opinion or certification shall be issued."[99] Fortis and the Court of Chancery properly acknowledged below that the Supreme Court of the United States has considered violations of the American Arbitration Association rules "highly significant" to a vacatur analysis.[100] Significantly, however, Fortis provides no authority supporting its proposition that professional

---

[97] *Id.* at 46.

[98] *Id.* Below, Fortis argued specifically that "[m]ultiple violations of professional standards governing an accounting firm's objectivity and impartiality should be given even greater weight [than a violation of the AAA administrative arbitrator disclosure rules], particularly given the close alignment between those standards and the FAA's evident partiality standard." App. to Opening Br. at A1282.

[99] App. to Opening Br. at A425.

[100] *Id.* at A1282 (citing *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 149 (1968)); *see also* Opening Br. Ex. C. at 20–21.

accounting standards should receive the same, let alone more expansive, treatment. The Court of Chancery "decline[d] to create such a rule."[101] We too decline to do so.

## III

For the reasons set forth above, we affirm the Court of Chancery's July 8, 2022 Order Granting Defendant's Motion to Compel Arbitration and to Dismiss Plaintiff's Verified Complaint and its March 28, 2025 Order Granting Defendant's Motion to Confirm Arbitration Award.

---

[101] Opening Br. Ex. C. at 21.